UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                      :

TOTO, INC.,                              :        Civ. No. 12-cv-1434 (LAK)

                        Plaintiff,      :

                - against -       :

SONY MUSIC ENTERTAINMENT,       :        **ECF CASE**

                      Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


## MEMORANDUM OF LAW IN SUPPORT OF
## SONY MUSIC ENTERTAINMENT'S MOTION TO DISMISS THE COMPLAINT

TABLE OF CONTENTS

Table of Authorities ................................................................................................. ii

Preliminary Statement ............................................................................................. 1

Statement of Facts .................................................................................................. 2

Argument ............................................................................................................... 7

I.      The Complaint Fails to State A Claim With Respect to Digital Exploitations of
        the Master Recordings. ................................................................................. 7

        A.      The Audiophile Provision Unambiguously Applies to All Digital Records ........... 8

        B.      Even In the Absence of an Audiophile Provision, Plaintiff Has Failed to
                Plead that the Lease Provision Applies to SME Records. ..................... 9

                1.      "Lease" and "License" Are Not Synonymous. ...................... 11

                2.      *F.B.T. Productions* is Irrelevant to Plaintiff's Lease Allegation. ............ 14

II.     The Second Cause of Action for Breach of the Implied Covenant of Good Faith
        and Fair Dealing is Duplicative of the Breach of Contract Claims and Must Be
        Dismissed. .................................................................................................. 16

Conclusion ............................................................................................................ 17

TABLE OF AUTHORITIES

**Page(s)**

CASES

*2619 Realty, LLC v. Fid. & Guar. Ins. Co.*,
    756 N.Y.S.2d 564 (1st Dep't 2003) ........................................................11

*Allman v. Sony BMG Music Entertainment*,
    2008 WL 2477465 (S.D.N.Y. Jun. 18, 2008) ...............................2, 9, 10

*Arch Ins. Co. v. Precision Stone, Inc.*,
    584 F.3d 33 (2d Cir. 2009) ....................................................................11

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S.Ct. 1937 (2009) ...................................................10

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*,
    90 F. Supp. 2d 401 (S.D.N.Y. 2001) (Kaplan, J.) ..................................16

*Deutsche Bank A.G. v. JPMorgan Chase Bank*,
    2009 WL 1505145 (2d Cir. May 29, 2009) ............................................11

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010) ....................................................................2

*Dobrova v. Holder*,
    607 F.3d 297 (2d Cir. 2010) ..................................................................11

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York*,
    375 F.3d 168 (2d Cir. 2004) ....................................................................8

*Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*,
    609 F.3d 111 (2d Cir. 2010) ..................................................................11

*F.B.T. Prods., LLC v. Aftermath Records*,
    2009 WL 137021 (C.D. Cal. Jan. 20, 2009) ..........................................15

*F.B.T. Productions, LLC v. Aftermath Records*,
    621 F.3d 958 (9th Cir. 2010) ...........................................................14, 15

*Fortune v. Group Long Term Disability Plan for Emps. of Keyspan Corp.*,
    2010 WL 3393758 (2d Cir. Aug. 30, 2010) ...........................................11

*Frank B. Hall & Co. of N.Y., Inc. v. Orient Overseas Assocs.*,
    48 N.Y.2d 958 (1979) .......................................................................13, 14

*Greenfield v. Philles Records*,
    98 N.Y.2d 562 (N.Y. 2002) ......................................................................8

*Hollinger, Inc. v. Hollinger Intern., Inc.,*
    858 A.2d 342 (Del. Ch. 2004)...................................................................................9

*Hugo Boss Fashions, Inc. v. Fed. Ins. Co.,*
    252 F.3d 608 (2d Cir. 2001).....................................................................................8

*India.com v. Dalal,*
    412 F.3d 315 (2d Cir. 2005)...................................................................................14

*Knott v. McDonald's Corp.,*
    147 F.3d 1065 (9th Cir. 1998) .................................................................................9

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.,*
    595 F.3d 458 (2d Cir. 2010).....................................................................................8

*NFL Enters. LLC v. Comcast Cable Commc'ns, LLC,*
    851 N.Y.S.2d 551 (1st Dep't 2008) .......................................................................13

*Peabody v. Weider Publ'ns, Inc.,*
    2006 WL 3802214 (S.D.N.Y. Dec. 26, 2006) ........................................................16

*Peconic Baykeeper, Inc. v. Suffolk Cnty.,*
    600 F.3d 180 (2d Cir. 2010)...................................................................................11

*Revson v. Cinque & Cinque, P.C.,*
    221 F.3d 59 (2d Cir. 2000).......................................................................................8

*S. Axelrod Co. v. Mel Dixon Studio, Inc.,*
    471 N.Y.S.2d 945 (Civ. Ct. 1983) .........................................................................13

*United States v. Ramirez,*
    420 F.3d 134 (2d Cir. 2005)...................................................................................11

*United States v. Zafar,*
    2008 WL 4138219 (2d Cir. Sept. 4, 2008) ............................................................11

*Wurtsbaugh v. Banc of Am. Secs.,*
    2006 WL 1683416 (S.D.N.Y. June 20, 2006) ..........................................................8


**RULES**

Fed. R. Civ. P. 12(b)(6)...............................................................................................2, 7

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY (9th ed. 2009) ...............................................................11, 12

OXFORD ENGLISH DICTIONARY ......................................................................11, 12, 13

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE
    UNABRIDGED (1986) ...................................................................................11, 12

### PRELIMINARY STATEMENT

In 1977 and again in 1983, plaintiff Toto, Inc. entered into recording agreements with a predecessor-in-interest to defendant Sony Music Entertainment ("SME").  The agreements provided that SME owned the recordings and could exploit them however it chose.  The agreements also set forth the royalty rates that SME would pay Toto in connection with various types of exploitations, including a main royalty rate applicable to sales through normal retail channels by SME "or its Licensee."  In 2002, the parties amended those agreements to set forth a new royalty rate specifically applicable to "all records made for digital playback."

Now, dissatisfied with the bargain that it struck, Toto hopes that this Court will award it a royalty on sales of digital downloads that is several times higher than that which it freely negotiated and to which SME agreed.  Toto argues that digital retailers such as Apple's iTunes have licensed the use of Toto's recordings from SME, and that this somehow means that royalties therefore must be calculated under a provision providing for payment of fifty percent of SME's net receipts from *leases* of those recordings.

Plaintiff's licensing allegation is false.  But even accepting it as true for purposes of this motion to dismiss, these allegations fail to state a claim under the unambiguous terms of the parties' contracts.  *First*, the agreements set forth a rate applicable to all "Audiophile records," without regard to whether they are sold by SME or its licensees.  "Audiophile records," in turn, is defined to include "all records made for digital playback."  This express royalty provision for all digital records, regardless of by whom they are sold, is dispositive of plaintiff's claim.

*Second*, even in the absence of this Audiophile provision, plaintiff's *licensing* allegations cannot implicate the agreements' *lease* provision—especially given that a different royalty provision specifically applies to sales of non-Audiophile records by SME "or its

licensees." *See Allman v. Sony BMG Music Entm't*, 2008 WL 2477465 (S.D.N.Y. Jun. 18, 2008)

(holding that allegations of licensing fail to state a claim under a "lease" provision).  In an

attempt to sidestep this obstacle to its claim, plaintiff alleges that "license" and "lease" simply

mean the same thing.  But plaintiff's allegations cannot alter the plain meaning of the contract.

As a matter of both ordinary English and contractual usage, the terms "license" and "lease" are

not synonymous.  Because plaintiff's claim is predicated entirely on the assertion that "lease"

and "license" mean the same thing in the agreement, the Complaint fails to state a claim that the

lease provision could apply.

       Plaintiff also seeks refuge in the implied covenant of good faith and fair dealing,

but that count must be dismissed as duplicative of the express claim for breach of contract.  SME

therefore requests that the Court dismiss with prejudice plaintiff's first cause of action insofar as

it concerns digital downloads, mastertones, and other digital records, plaintiff's second cause of

action for breach of the implied covenant of good faith and fair dealing, and plaintiff's fourth

cause of action seeking a declaratory judgment.

## STATEMENT OF FACTS

       The following statement of facts is drawn from the allegations of the Complaint

and the terms of the parties' agreements, which the Complaint refers to and relies upon.  *See*

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to

dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider …

documents incorporated by reference in the complaint.") (citation omitted).  For purposes of this

motion, and despite the numerous misstatements in the Complaint—including the Complaint's

allegation that SME licenses sound recordings to digital retailers rather than selling digital

downloads to them—SME treats plaintiff's factual allegations as if they were true, except where contradicted by the terms of the parties' agreements.

### *The 1977 Agreement*

On December 10, 1977, Toto entered into a recording agreement with CBS Records ("CBS"), a predecessor-in-interest of SME (the "1977 Agreement").[1]  Pursuant to Article 7, recordings of musical performances created under the contract ("Master Recordings") became SME's "sole property" to exploit as it chose.[2]  In exchange, SME agreed to pay royalties on various exploitations of those Master Recordings as specified in the agreement.[3]  The agreement contains a New York choice-of-law provision.[4]

Article 9 of the 1977 Agreement established the royalties payable to plaintiff under the recording contract.  It begins with an overarching royalty provision, ¶ 9.01, that governs Toto records sold through ordinary retail channels, regardless of whether sold by SME or by a licensee (the "NRC Provision"):

> [SME] will pay you a basic royalty as follows in respect of Net Sales of Phonograph Records consisting entirely of Master Recordings performed by the Artist and recorded hereunder and sold by [SME] or its Licensee Through Normal Retail Channels for distribution in the United States….[5]

---

[1] Compl. ¶ 6; *see* Merrill Decl., Ex. 1, at 1.

[2] *Id.* ¶ 7.01.

[3] *See id.* ¶ 9.

[4] *Id.* ¶ 20.06.

[5] *Id.* ¶ 9.01(a)(1).

The 1977 Agreement defines "Phonograph Records" and "Records" broadly to include "all forms of reproductions, now or hereafter known,"[6] and specifically provides that the term "Licensee" is not limited to subsidiaries or divisions of SME.[7]

Article 9 of the 1977 Agreement also contains various provisions for other types of exploitations of Toto's Master Recordings. Plaintiff's lawsuit is based on ¶ 9.03, which sets forth reduced royalties for a variety of exploitations that are ancillary to SME's principal business of making and selling records to consumers, including distribution of Phonograph Records to specialty markets such as educational institutions or libraries, and manufacture of records on a custom basis for a specific customer.[8] The end of the paragraph states: "In respect of any Master Recording leased by [SME] to others for their distribution of Phonograph Records in the United States, [SME] will pay you 50% of [SME's] net receipts therefrom…" (the "Lease Provision").[9]

### The 1983 Agreement

On January 27, 1983, Toto and SME entered into a second agreement pursuant to which another set of Master Recordings became the "sole property" of SME (the "1983 Agreement").[10] The 1977 and 1983 Agreements are similar in all respects pertinent to this motion:

---

[6] *Id.* ¶ 14.05; *see also* Compl. ¶ 23 (asserting that "music downloads, mastertones, and ringtones are 'Phonograph Records'").

[7] *Id.* ¶ 14.19 (defining "Licensees" to include "*without limitation*, subsidiaries, wholly or partly owned, and other divisions of CBS, Inc.") (emphasis added).

[8] *Id.* ¶ 9.03

[9] *Id.*

[10] Merrill Decl., Ex. 2 , at 1 (1983 Agreement).

- Article 9 of the 1983 Agreement contains an "NRC Provision" which applies to all sales of such records through Normal Retail Channels, whether by SME "or its Licensee."[11]

- Article 9 of the 1983 Agreement addresses sales to libraries and educational institutions, products prepared for a client on a custom basis, and a "Lease Provision" which establishes a royalty rate for sales of Master Recordings "leased" to others for distribution in the United States.[12]

- Article 20 of the 1983 Agreement contains a New York choice-of-law clause.[13]

### The 1986 Amendment

On December 12, 1986, the parties entered into an amendment to the 1983 Agreement (the "1986 Amendment") which, among other things, introduced a royalty provision specific to records for digital playback.[14]  Section 3(a) of the 1986 Amendment provides that "[n]otwithstanding any provision of the [1983] Agreement to the contrary, the royalty on an 'Audiophile record' … will be as follows…."[15]

Section 3(b), in turn, provides that:

> As used in this paragraph 3, the term "Audiophile records" shall mean Records (other than audiovisual Records) marketed in specially priced catalog series by reason of their superior sound quality or other distinctive technical or artistic characteristics (*all Records made for digital playback are Audiophile records*), and the term "Standard Records" shall mean Records other than Audiophile Records and audiovisual Records.[16]

---

[11] *Id.* ¶ 9.01.

[12] *Id.* ¶ 9.03 ("In respect of any Master Recording leased by [SME] to others for their distribution of Phonograph Records in the United States, [SME] will pay you fifty percent (50%) of [SME's] net receipts therefrom….")

[13] *Id.* ¶ 20.06.

[14] Merrill Decl., Ex. 3, at 1 (1986 Amendment).

[15] *Id.* ¶ 3(a)(i) and (ii).

[16] *Id.* ¶ 3(b) (emphasis added).

### The 2002 Amendment

In 2002, the parties amended both the 1977 and 1983 Agreements (as amended, the "Toto Agreement").[17]  The 2002 amendment modified the 1986 Agreement's royalty provision for Audiophile records, and extended it to the 1977 Agreement, as well (the "Audiophile Provision"):

> Notwithstanding anything to the contrary contained in Article 9 of the 1977 Agreement and solely with respect to *sales after December 31, 1998 of Audiophile Records released under either of the Agreements*, the royalty rate on such Records shall be eighty percent (80%) of the royalty rate specified in subparagraph 9.01(b) of the 1983 Agreement subject to the terms thereof, including, without limitation, subsection 3(a)(ii)(A) of the 1986 Amendment.[18]

The definition of "Audiophile record" in the 2002 amendment is the same as that set forth in the 1986 Amendment, and thus includes "all Records made for digital playback."[19]

### The Instant Lawsuit

Plaintiff commenced this lawsuit on February 27, 2012.  The Complaint claims principally that SME breached the Toto Agreement by failing to calculate royalties on sales of music downloads, mastertones, and ringtones pursuant to the Lease Provision in the 1977 and 1983 Agreements.[20]  In support of this claim, it alleges that digital retailers such as Apple's iTunes have "licensed" Toto's Master Recordings from SME, and that "leased" is "Sony's

---

[17] Merrill Decl., Ex. 4, at 1.

[18] *Id.* ¶ 4(a) (emphasis added)

[19] *Id.* at 1 ("Unless otherwise stated, all terms defined in the Agreements will have the same meanings when used in their respective contexts herein.")

[20] Compl. ¶¶ 21-23, 29-33.

parlance" for "licensed."[21]  The Complaint also alleges that SME has incorrectly calculated

royalties in other ways that are not a subject of this motion.  It asserts causes of action for

(i) breach of contract, (ii) breach of the duty of good faith and fair dealing, (iii) accounting, and

(iv) declaratory judgment.  SME now moves pursuant to FRCP 12(b)(6) to dismiss with

prejudice the first cause of action as it relates to digital records, as well as the second and fourth

causes of action.

ARGUMENT

Plaintiff's claim that royalties on sales of digital downloads, mastertones and

ringtones should be accounted for under the Lease Provisions of the 1977 and 1983 Agreements

fails to state a cause of action under the unambiguous terms of the Toto Agreement, for two

simple reasons.  *First*, the Audiophile Provision specifically sets forth the royalty rate applicable

to all digital records.  *Second*, even were the Audiophile Provision somehow not to apply, the

Lease Provision by its terms applies only to "leases"—not to sales of Toto records by licensees.

Because plaintiff's claim is predicated on the allegations that (i) download providers are SME's

"licensees", but (ii) lease is "Sony's parlance" for license, plaintiff has not sufficiently alleged

any such lease.

In addition, plaintiff's claim for breach of the covenant of good faith and fair

dealing is duplicative of its breach of contract claim, and therefore must be dismissed as well.

## I.   The Complaint Fails to State A Claim With Respect to Digital Exploitations of the Master Recordings.

"Despite the technological innovations that continue to revolutionize the

recording industry, long-settled common-law contract rules still govern the interpretation of

---

[21] *Id.* ¶ 21; *see also id.* ¶ 28 (referring to download providers as "licensees").

agreements between artists and their record producers." *Greenfield v. Philles Records*, 98

N.Y.2d 562, 569 (N.Y. 2002).  Thus, "a written agreement that is complete, clear and

unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.*

"The matter of whether the contract is ambiguous is a question of law for the

court." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir.

2010).  Thus, plaintiff's *allegations* about the meaning of the Toto Agreement are irrelevant to

the Court's construction of that agreement on its face; plaintiff's breach of contract and

declaratory judgment claims must be dismissed if at odds with the unambiguous terms of the

contract.  *See, e.g.*, *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001)

(recognizing that contractual "ambiguity does not exist simply because the parties urge different

interpretations") (quotations omitted); *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d

Cir. 2000) ("Under New York law, the meaning of a contract that is unambiguous is a question

of law for the court to decide."); *see also Wurtsbaugh v. Banc of Am. Secs.*, 2006 WL 1683416,

at *5 (S.D.N.Y. June 20, 2006) ("'[I]f an agreement is complete, clear and unambiguous on its

face' … a breach of contract claim may be dismissed on a Rule 12(b)(6) motion.") (quoting

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York*, 375 F.3d 168,

177 (2d Cir. 2004)).

A.      **The Audiophile Provision Unambiguously Applies to All Digital Records.**

Plaintiff's claim with respect to royalties on digital downloads, mastertones and

ringtones is foreclosed by the Audiophile Provision of the Toto Agreement, which

unambiguously prescribes the royalty rate for *all* digital records.

Under the plain meaning of the Toto Agreement's terms, digital downloads, mastertones and ringtones are "Audiophile records":  there is no question that digital downloads, mastertones and ringtones are made for digital playback,[22] and paragraph 3(b) of the 1986 Amendment provides that "all Records made for digital playback are Audiophile records."[23] *See Knott v. McDonald's Corp.*, 147 F.3d 1065, 1067 (9th Cir. 1998) ("In short, 'all' means all."); *Hollinger, Inc. v. Hollinger Intern., Inc.,* 858 A.2d 342, 377 (Del. Ch. 2004) (Strine, V.C.) ("'All' means 'all,'" or if that is not clear, all, when used before a plural noun such as 'assets,' means '[t]he entire or unabated amount or quantity of; the whole extent, substance, or compass of; the whole.'") (quoting Oxford English Dictionary).

The Audiophile Provision, in turn, provides that the royalty rate for all Audiophile Records—with no distinction drawn between those sold by SME and those sold by a licensee— will be eighty percent of the royalty rate established in 9.01(b) of the 1983 Agreement.[24]  That disposes of plaintiff's bid to apply the Lease Provision to downloads, mastertones, and ringtones.

**B.    Even In the Absence of an Audiophile Provision, Plaintiff Has Failed to Plead that the Lease Provision Applies to SME Records.**

Even were there no Audiophile Provision, plaintiff has failed to sufficiently allege that the Lease Provision would apply to digital downloads under the agreements.  In *Allman v. Sony BMG Music Entertainment*, 2008 WL 2477465 (S.D.N.Y. Jun. 18, 2008), this court dismissed a breach of contract action brought by a recording artist who similarly alleged that download providers were licensees, and therefore sought to have a lease provision applied to digital downloads.  The court found that "[b]y its express terms, this provision pertains to the

---

[22] *See* Compl. ¶ 21.

[23] Merrill Decl., Ex. 3 at ¶ 3(b).

[24] Merrill Decl., Ex. 4, at ¶ 4.

payment of fifty percent of net receipts when 'any Master Recordings is leased…'" *Id.* The court therefore dismissed the claim, because plaintiff asserted the existence of a license but failed to plead "any allegations that the master recordings were leased." *Id.*

Plaintiff in this action attempts to sidestep the *Allman* decision through a semantic sleight-of-hand: the Complaint states that "Music Download and Mastertone Providers are third-parties that licensed (or 'leased' in Sony's parlance,) the Masters from Sony…."[25] Thus, plaintiff unequivocally alleges that Music Download and Mastertone Providers are licensees—an allegation that is repeated again in paragraph 28 of the Complaint—but asserts that "lease" is synonymous with "license," and on that basis represents in the remainder of the Complaint that music download providers "lease" the recordings.

But the terms "license" and "lease" are decidedly *not* synonymous. As a simple matter of ordinary usage, the words carry distinct definitions and meanings—and that distinction is only reinforced by the separate use of both terms in the Toto Agreement.

Because plaintiff's lease allegation is specifically predicated on an assertion about the meaning of the contract that is at odds with the Toto Agreement's unambiguous terms, it fails to state a claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). Here, however, plaintiff's allegations allow only for the opposite inference: because plaintiff acknowledges that the only basis for its lease allegation is the assertion that lease and license

---

[25] Compl. ¶ 21.

mean the same thing, the Complaint fails to allege any facts that could state a plausible claim that

the Lease Provision applies—no matter how many times the Complaint recites the word "lease."

<strong>1.    "Lease" and "License" Are Not Synonymous.</strong>

"[I]t is common practice for the courts of [New York] to refer to the dictionary to

determine the plain and ordinary meaning of words to a contract."  *2619 Realty, LLC v. Fid. &*

*Guar. Ins. Co.*, 756 N.Y.S.2d 564, 566 (1st Dep't 2003) (citation omitted).  The Second Circuit

most often looks to three respected dictionaries to establish the definition of disputed contractual

terms:  Black's Law Dictionary,[26] Webster's Third New International Dictionary,[27] and the

Oxford English Dictionary.[28]

All of these dictionaries reflect that in ordinary usage, a "lease" describes rights in

connection with tangible goods or real property; it does *not* describe a grant of intellectual

property rights and is not synonymous with "license."  Black's Law Dictionary, for example,

defines "lease" as:

> **Lease**, . . . **1.** A contract by which a rightful possessor of real
> property conveys the right to use and occupy the property in
> exchange for consideration, usu. rent.  The lease can be for life, for
> a fixed period, or for a period terminable at will; . . . **2.** Such a
> conveyance plus all covenants attached to it. **3.** The written
> instrument memorializing such a conveyance and its covenants. —
> Also termed *lease agreement; lease contract*. **4.** The piece of real

---

[26] *See, e.g., Fortune v. Group Long Term Disability Plan for Emps. of Keyspan Corp.*, 2010 WL
3393758, *4 (2d Cir. Aug. 30, 2010); *Deutsche Bank A.G. v. JPMorgan Chase Bank*, 2009 WL
1505145, *3 (2d Cir. May 29, 2009); *United States v. Zafar*, 2008 WL 4138219, *2 (2d Cir.
Sept. 4, 2008).

[27] *See, e.g., Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010); *Peconic Baykeeper, Inc. v.
Suffolk Cnty.*, 600 F.3d 180, 188-89 (2d Cir. 2010); *Zafar*, 2008 WL 4138219, *2; *United States
v. Ramirez*, 420 F.3d 134, 144-45 (2d Cir. 2005).

[28] *See, e.g., Dobrova*, 607 F.3d at 301; *Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*, 609
F.3d 111, 121 (2d Cir. 2010); *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 37 (2d Cir.
2009).

property so conveyed. **5.** A contract by which the rightful
possessor of personal property conveys the right to use that
property in exchange for consideration.[29]

Black's definition of the term "license", by contrast, specifically *distinguishes it* from a lease:

**License**, . . . **1.** A permission, usu. revocable, to commit some act
that would otherwise be unlawful; esp., an agreement (not
amounting to a lease or profit à prendre) that it is lawful for the
licensee to enter the licensor's land to do some act that would
otherwise be illegal, such as hunting game.[30]

Moreover, Black's includes various subsidiary definitions of "license" that encompass grants of

intellectual property rights, none of which fall within its definition of "lease."[31]

Like Black's, Webster's Third New International Dictionary (i) defines "lease" to

concern only real property or tangible goods; (ii) includes grants of intellectual property rights

only in the definition of "license"; and (iii) specifically distinguishes the two terms from each

other:

**Lease** . . . **1:** a contract by which one conveys lands, tenements, or
hereditaments for life, for a term of years, or at will for any less
interest than that of the lessor, usu. for a specified rent or
compensation; *also:* the act of such conveyance, the instrument by
which it is made, or the term for which it is made — distinguished
from *license*  **2:** a piece of land or property that is leased . . . .[32]

**License**  *or* licence  . . . **3b:** authority or permission of one having
no possessory rights in land to do something on that land which
would otherwise be unlawful or a trespass—distinguished from
*lease*. . . . **d:**  the grant of some but not all of the rights embraced in
a copyright.[33]

---

[29] BLACK'S LAW DICTIONARY 970 (9th ed. 2009) (emphasis in original).

[30] *Id.* 1002 (emphasis added).

[31] *Id.*  A complete copy of all of these subsidiary definitions is appended to this brief.

[32] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE
UNABRIDGED 1286 (1986) (emphasis added).

[33] *Id.* 1304 (emphasis added).  A complete copy of the definition is appended to this brief.

The Oxford English Dictionary similarly defines the two terms:

> **Lease**, . . . **1.** A contract between parties, by which one conveys
> lands or tenements to the other for life, for years, or at will, usually
> in consideration of rent or other periodical compensation. . . .
> **b.** The instrument by which such a conveyance is made.  **c.** The
> period of time for which the contract is made.[34]
>
> **License, Licence**, . . . **4.** To authorize the publication of (a book),
> or the acting of (a play).[35]

The Toto Agreement's separate use of both terms in the same agreement only

reinforces that the two words have separate meanings.  In drafting the Toto Agreement, the

parties chose to use the term "licensee" 51 separate times in 30 separate provisions, including the

NRC Provision,[36] and to use the term "license" 22 separate times in 18 separate provisions of the

Agreement.[37]  By contrast, the parties chose to use the distinct term "lease" only in the Lease

Provision and its foreign equivalent.[38]  "The use of different terms in the same agreement

strongly implies that the terms are to be accorded different meanings."  *NFL Enters. LLC v.*

*Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 557 (1st Dep't 2008); *see also S. Axelrod*

*Co. v. Mel Dixon Studio, Inc.*, 471 N.Y.S.2d 945, 951 (Civ. Ct. 1983) ("arguably . . .

synonymous . . . terms should be treated as mutually exclusive, rather than as synonyms"); *Frank*

---

[34] The Oxford English Dictionary Online (2d ed. 2010),
http://www.oed.com/view/Entry/106729?rskey=6OOaim&result=2&isAdvanced=false# (last
visited Mar. 21, 2012).

[35] *Id.*, http://www.oed.com/viewdictionaryentry/Entry/107946 (last visited Mar. 21, 2012).  A
complete copy of the definition is appended to this brief.

[36] *See* Merrill Decl., Ex. 1, at ¶¶ 7.03, 9.01, 9.06, 9.07, 10.03, 11.02, 13.05, 14.10, 14.19, 14.22,
17.01; Merrill Decl., Ex. 2, at ¶¶ 6.02, 7.03, 9.01, 9.06, 9.07, 9.08, 10.03, 11.02, 12.06, 13.05,
14.06, 14.10, 14.12, 14.19, 14.22, 14.23, 14.26, 17.01; Merrill Decl., Ex. 3, at ¶ 3(a).

[37] *See* Merrill Decl., Ex. 1, at ¶¶ 4.01, 12, 12.02, 12.03, 12.04, 14.20, 17.01; Merrill Decl., Ex. 2,
at ¶¶ 4.01, 12, 12.01, 12.02, 12.03, 12.04, 12.05, 12.06, 14.20, 17.01.

[38] Merrill Decl., Ex. 1, at ¶¶ 9.03, 9.07; Merrill Decl., Ex. 2, at ¶¶ 9.03, 9.07.

*B. Hall & Co. of N.Y. v. Orient Overseas Assoc.*, 48 N.Y.2d 958, 959 (1979) ("difference in the language of the two [contract] provisions [means] the parties must be deemed to have intended different meanings").

Indeed, were "lease" and "license" synonymous, two separate royalty provisions—the NRC Provision (which applies to sales by SME "or its Licensee") and the Lease Provision—would both purport to apply to sales of records by licensees.  Such a construction would be disfavored in any circumstance, because "[e]ffect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all its terms." *India.com v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005) (internal citation and quotation omitted).  But it is especially untenable here, where the conflict arises only if two distinct terms with two distinct meanings are somehow deemed to be synonymous.

2.    ***F.B.T. Productions* is Irrelevant to Plaintiff's Lease Allegation.**

The Complaint also alleges that SME's position that the Lease Provision does not apply to digital downloads was "explicitly rejected" by another case involving a claim for a fifty-percent royalty on digital downloads, *F.B.T. Productions, LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010).[39]  Nonsense.  *F.B.T.* involved a different record company and a different contract with markedly different terms, and it makes no mention whatsoever of the word "lease."

The recording agreement at issue in *F.B.T.* had two key royalty provisions.  The first was a "Records Sold Provision," which specified a royalty rate for "full price records sold in the United States . . . through normal retail channels."  621 F.3d at 961.  The second was a separate "Masters Licensed Provision," which provided that "[o]n masters *licensed* by us . . . to

_____

[39] Compl. ¶ 28.

others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts from the sale of those records or from other uses of the masters."  *F.B.T. Productions, LLC v. Aftermath Records*, 2009 WL 137021, *1 (C.D. Cal. Jan. 20, 2009) (emphasis added).  The Masters Licensed Provision applied "[n]otwithstanding the foregoing [Records Sold Provision]."  621 F.3d at 961.  The Ninth Circuit concluded that Aftermath had licensed the plaintiff's sound recordings to Apple, and that Aftermath was obligated to calculate royalties under the "Masters Licensed Provision."[40] 621 F.3d at 964-66.

The difference between those contract terms and the terms of the Toto Agreement are so great that they only reinforce the futility of Toto's claim.  *First*, the recording agreement in *F.B.T.* did not contain a royalty provision specific to digital records.  In contrast, the Toto Agreement contains an Audiophile Provision that is expressly applicable to "[a]ll records made for digital playback."  *Second*, the Records Sold Provision in *F.B.T.* did not refer to sales by licensees.  *Id.* at 961.  In contrast, Plaintiff's NRC Provision refers to sales of "Phonograph Records . . . by CBS *or its Licensee*."[41]  *Third*, the Masters Licensed Provision in *F.B.T.* referred to masters that were "licensed," not "leased."  621 F.3d at 961.  *F.B.T.* did not construe the meaning of, or so much as even mention, the term "lease."

*Fourth,* as the Ninth Circuit emphasized, the Masters Licensed Provision applied "[n]otwithstanding the foregoing [Records Sold Provision]."  *Id.*  In the Toto Agreement, by contrast, it is the Audiophile Provision—*not* the Lease Provision—that is prefaced by a clause

---

[40] *F.B.T.'s* determination that Aftermath had licensed sound recordings to Apple obviously says nothing about whether SME has done so under the terms of *its* agreement with Apple.

[41] Merrill Decl., Ex. 1, at ¶ 9.01; Merrill Decl., Ex. 2, at ¶ 9.01.

15

stating that it applies "*[n]otwithstanding anything to the contrary*" in the agreement.[42]  Thus, if

anything, *F.B.T.* supports application of the Audiophile Provision to sales in the form of digital

downloads and highlights plaintiff's failure to state a claim.

*      *      *

For all these reasons, plaintiff's first cause of action for breach of contract should

be dismissed with respect to digital downloads and plaintiff's fourth cause of action for

declaratory judgment should be dismissed in its entirety.

**II.    The Second Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing is Duplicative of the Breach of Contract Claims and Must Be Dismissed.**

"Under New York law, a claim for breach of the implied covenant will be

dismissed as duplicative if the conduct allegedly violating the implied covenant is also the

predicate for breach of the underlying contract."  *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F.

Supp. 2d 401, 419 (S.D.N.Y. 2001) (Kaplan, J.); *see also Peabody v. Weider Publ'ns, Inc.*, 2006

WL 3802214, at *5 (S.D.N.Y. Dec. 26, 2006) (holding that plaintiff could not maintain implied

covenant claim that was based on the same conduct as his breach of contract claim).  Here,

plaintiff's implied covenant claim unquestionably is based on the same conduct as their breach of

contract claims.  The breach of contract claim alleges that SME "has failed to comply with the

terms of the Recording Agreements, and failed to fulfill its obligations under the Recording

Agreements, by failing to properly account to and pay Toto royalties for sales of the Masters."[43]

---

[42] Merrill Decl., Ex. 4, at ¶ 4(a) (emphasis added); *see also* Merrill Decl., Ex. 3 at  ¶ 3(a) ("Notwithstanding any provision of the Agreement to the contrary…").

[43] Compl. ¶¶ 41-42.

16

The implied covenant claim, in turn, contends that SME "has wrongfully withheld the benefits of the Recording Agreements from Toto [and] frustrated the purpose of the Recording Agreements."[44]  As a result, the second cause of action is duplicative of the breach of contract claims and must be dismissed.

CONCLUSION

For the reasons stated above, this Court should dismiss with prejudice:  (i) the first cause of action with respect to digital downloads, mastertones, ringtones, and other digital records; and (ii) the second and fourth causes of action in their entirety.

Dated: New York, New York
      March 22, 2012

Respectfully submitted,

COVINGTON & BURLING LLP

By: /s Jonathan M. Sperling
     Jonathan M. Sperling
     Gina R. Merrill

620 Eighth Avenue
The New York Times Building
New York, New York 10018
(212) 841-1000

*Attorneys for Defendant*
*Sony Music Entertainment*

---

[44] *Id.* ¶ 47.

# APPENDIX —DICTIONARY DEFINITIONS

BLACK'S LAW DICTIONARY 1002-04 (9th ed. 2009)

**license,** *n.* (15c) **1.** A permission, usu. revocable, to commit some act that would otherwise be unlawful; esp., an agreement (not amounting to a lease or profit à prendre) that it is lawful for the licensee to enter the licensor's land to do some act that would otherwise be illegal, such as hunting game. See SERVITUDE (1). [Cases: Licenses ⬠43.]

> "[A] license is an authority to do a particular act, or series of acts, upon another's land, without possessing any estate therein. It is founded in personal confidence, and is not assignable, nor within the statute of frauds." 2 James Kent, *Commentaries on American Law* *452–53 (George Comstock ed., 11th ed. 1866).

**2.** The certificate or document evidencing such permission. — **license,** *vb.*

**artistic license.** An open-source license that prohibits the sale of modified software unless it is included in a package with other software.

**bare license.** (17c) A license in which no property interest passes to the licensee, who is merely not a trespasser. ● It is revocable at will. — Also termed *naked license; mere license.* [Cases: Copyrights and Intellectual Property ⬠48.]

**blanket license.** *Copyright.* A license granted by a performing-rights society, such as ASCAP or BMI, to use all works in the society's portfolio in exchange for a fixed percentage of the user's revenues.

**box-top license.** See *shrink-wrap license.*

**BSD license.** A form of open-source license that allows users to incorporate the source code into proprietary products as long as the names of the original creator or contributors are not used to endorse or promote the products without permission. ● It was originally created for the Berkeley Software Distribution operating system developed at the University of California. — Also termed *BSD-style license.*

**click-wrap license.** See POINT-AND-CLICK AGREEMENT.

**compulsory license. 1.** *Copyright.* A statutorily created license that allows certain parties to use copyrighted material without the explicit permission of the copyright owner in exchange for a specified royalty. — Also termed *equitable remuneration.* [Cases: Copyrights and Intellectual Property ⬠48.1.] **2.** *Patents.* A statutorily created license that allows certain people to pay a royalty and use an invention without the patentee's permission. ● While some nations currently recognize compulsory licenses, the United States never has.

**cross-license.** *Patents.* An agreement between two or more patentees to exchange licenses for their mutual benefit and use of the licensed products. [Cases: Patents ⬠206.]

**distribution license.** A marketing license, usu. limited by geography.

**exclusive license.** (18c) A license that gives the licensee the sole right to perform the licensed act, often in a defined territory, and that prohibits the licensor from performing the licensed act and from granting the right to anyone else; esp., such a license of a copyright, patent, or trademark right. [Cases: Patents ⬡ 211(1).]

**general-public license.** See *open-source license.*

**implied license.** A royalty-free license arising from a property owner's conduct regarding another person's use of the property even though the owner has not expressly consented to the property's use. ● In a patent context, for example, the circumstances surrounding the conduct give rise to an affirmative grant of consent or permission to infringe a patent's claims. For example, the conduct of a patentee who encourages the manufacture of infringing products may be construed as an implied license to use the patent. An implied license may also arise when a patentee authorizes the sale or express grant of a license to a buyer, who then resells the license to a third party; the third party is the patentee's implied licensee. [Cases: Patents ⬡ 210.]

**implied license by acquiescence.** An implied license that arises from the patentee's tacit or passive acceptance of or implied consent to an otherwise infringing act.

**implied license by conduct.** An implied license based on the patentee's course of conduct, including language, from which another person could properly infer that the patentee consented to the other's use of the patent. See *implied license by equitable estoppel; implied license by legal estoppel.*

**implied license by equitable estoppel.** An implied license usu. based on the patentee's failure to take timely action to enforce patent rights against an infringer after objecting to the infringer's actions, thereby misleading the infringer to believe that the patentee will not act. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1042–43 (Fed. Cir.1992).

**implied license by legal estoppel.** An implied license usu. based on the patentee's broadcast grant of a right or interest that cannot be derogated by the patentee's later acts.

**label license.** A notice on an item's package granting the purchaser a license to practice the process by using the item without additional payments to the licensor.

**license coupled with an interest.** (1836) An irrevocable license in real estate that confers the right (not the mere permission) to perform an act or acts upon the property; esp., a license incidental to the ownership of an interest in a chattel located on the land with respect to which the license exists. ● This type of license is considered an interest in the land itself. An injunction may be obtained to prevent the wrongful revocation of such a license. — Also termed *license coupled with the grant of an interest.* [Cases: Licenses ⬡ 43, 58(2).]

"A licence may be coupled with some interest in the land or chattels thereon. Thus the right to enter another man's land to hunt and take away the deer killed, or to cut down a tree and remove it, involves the grant of an interest in the deer or tree and also a licence annexed to it to come on the land. The interest must be a recognised interest in the property, and it must have been validly created. Thus at law a right to take game or minerals, being a *profit à prendre*, must have been created by deed or prescription, whereas no formalities are required for the grant of a right to take away chattels, such as felled or cut hay. Equity will give effect to a specifically enforceable agreement to grant an interest, so that a licence coupled with a *profit à prendre* granted merely in writing but for value may be protected by injunction." Robert E. Megarry & M.P. Thompson, *A Manual of the Law of Real Property* 428 (6th ed. 1993).

**limited license.** A license that is narrow in scope or narrower than another license granted for the same purpose, or a license subject to conditions or limitations.

**mechanical license.** A grant of the right to produce and release a copyrighted work in exchange for a royalty based on the number of units manufactured and sold. [Cases: Copyrights and Intellectual Property 48.]

**mere license.** See *bare license.*

**Mozilla public license.** An open-source license that allows software users to modify and publicly distribute the software, but requires users to release the changed software under the same copyright as the original source code, and to release all claims to patent rights. ● The Mozilla public license was developed for the Netscape and Netscape Communicator browsers but is not limited to use with them. — Abbr. MPL.

**naked license. 1.** A license allowing a licensee to use a trademark on any goods and services the licensee chooses. [Cases: Trademarks 1208.] **2.** See *bare license.*

**nonexclusive license.** A license of intellectual-property rights that gives the licensee a right to use, make, or sell the licensed item on a shared basis with the licensor and possibly other licensees.

**nonmetered license.** *Patents.* An agreement to allow a patent's use in exchange for a flat percentage of sales, regardless of how much the patent is actually used. ● The Supreme Court rejected a nonmetered license as patent misuse, saying the buyer has a right to insist on paying only for actual use. *Zenith Radio Co. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562 (1969). See PATENT-MISUSE DOCTRINE. [Cases: Patents 218(5).]

**off-sale license.** A state-issued permit to sell alcoholic beverages that may be taken away from and consumed off the premises. — Also termed *off-premises license.* Cf. *on-sale license.* [Cases: Intoxicating Liquors 59.]

**on-sale license.** A state-issued permit to sell alcoholic beverages to be consumed on the premises only. — Also termed *on-premises license.* Cf. *off-sale license.* [Cases: Intoxicating Liquors 59.]

**open-source license.** A license that allows open-source software users to copy, distribute, or modify the source code, and publicly distribute derived works based upon the source code. ● Open-source licenses usu. do not require royalty or other fees on distribution. The license typically requires a user who redistributes original or modified software that was received under an open-source license to provide the original license terms, including all disclaimers, to all future users, and to distribute the source code with any machine-executable software. It is unclear who has the right or power to enforce the terms of an open-source license. — Sometimes termed *general-public license.* [Cases: Copyrights and Intellectual Property ⬠107.]

**proprietary license.** A license that restricts a software user's ability to copy, distribute, or modify the software.

**shrink-wrap license.** (1984) A license printed on the outside of a software package to advise the buyer that by opening the package, the buyer becomes legally bound to abide by the terms of the license. ● Shrink-wrap licenses usu. seek to (1) prohibit users from making unauthorized copies of the software, (2) prohibit modifications to the software, (3) limit use of the software to one computer, (4) limit the manufacturer's liability, and (5) disclaim warranties. — Also written *shrinkwrap license.* — Also termed *box-top license*; *tear-me-open license.* See POINT-AND-CLICK AGREEMENT. [Cases: Copyrights and Intellectual Property ⬠107.]

**site license.** *Copyright.* A software license that allows a company to install a set number of copies on individual computers within the company.

**synchronization license.** A license to reproduce and synchronize a copyrighted musical composition with visual images that are not covered by the musical work's copyright. ● Synchronization rights are commonly associated with audiovisual productions, such as music videos or movies. [Cases: Copyrights and Intellectual Property ⬠48, 107.]

**tear-me-open license.** See *shrink-wrap license.*

**use-based license.** An open-source software license to which the user assents by acting according to the license's terms, namely by using, modifying, or distributing the licensed software. ● Unlike a point-and-click agreement, the user does not have to expressly declare acceptance of the license terms before using the software. [Cases: Copyrights and Intellectual Property ⬠107.]

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED
1304 (1986)

¹li·cense or li·cence \'līs°n(t)s\ *n* -s *see* sense 5 [ME *licence,* fr. MF, fr. L *licentia,* fr. *licent-, licens* (pres. part.) of *licēre* to be permitted; be for sale) +*-la* -*y*: akin to Latvian *līkt* to come to terms] **1 :** permission to act (go from hence without their ~ —Daniel Defoe) . **2 a :** unusual freedom of action permitted because of extenuating circumstances or special prerogatives (in the decoration the Chinese silversmiths had been allowed the utmost ~ —Osbert Lancaster) (reason and common sense were given full ~ to take no notice of pedants —Stuart Hampshire) (had a stranger's ~ to go everywhere — Nadine Gordimer) **b (1) :** excessive freedom : the abuse of liberties granted (a wave of municipal reform . . . for the correction of what was regarded as ~ —Havelock Ellis) (Caesar's legions . . . were enjoying their victory in the ~ which is miscalled liberty —J.A.Froude) (freedom of the press also carries the grave responsibility that it not be turned into ~ —*Time*) **(2) :** abusive disregard for rules of personal conduct : LICENTIOUSNESS (like most women of that character and those circumstances her ~ was peculiarly unlimited —Tennessee Williams) (prenuptial chastity in one tribe and adolescent ~ in another —Ruth Benedict) **3 a (1) :** a right or permission granted in accordance with law by a competent authority to engage in some business or occupation; to do some act, or to engage in some transaction which but for such license would be unlawful (a ~ to sell liquor) (a marriage ~) (a ~ to practice medicine) **(2) :** a document evidencing a license granted **b :** authority or permission of one having no possessory rights in land to do something on that land which would otherwise be unlawful on a trespass — distinguished from *lease* **c :** the grant by a patent holder to another of any of the rights embodied in the patent short of an assignment of a fractional interest therein and short of assigning all the rights protected by the patent **d :** the grant of some but not all of the rights embraced in a copyright **e** *Canad* **:** a free miner's certificate **4 :** a deviation from strict fact, form, or rule utilized by an artist or writer on the assumption that it will be permitted for the sake of the advantage or effect gained (permitting myself a certain ~ of treatment, the better to round out the picture —S.H.Adams) (has little truck with those who have taken literary ~ —D.L.Horner) **5** *pl* license *chiefly Midland* **a :** formal permission from local authorities **b :** a document embodying such permission (get a pair o' license fer to marry —J.W.Riley)

²license *also* licence \"\ *vt* -ED/-ING/-S [ME *licencen,* fr. *licence,* n.] **1 a :** to grant or issue a license to (someone) usu. after special qualifications have been met (was *licensed* and later ordained to the ministry —J.C.Brauer) **b :** to permit or authorize esp. by formal license (patented processes were freely *licensed* in a general effort to do everything and anything to help win the war —Marquis James) . **2 a :** to accord permission or consent to : ALLOW (at a wedding everybody seemed *licensed* to kiss everyone else —Irwin Shaw) (a popular novelist may be *licensed* to draw on his imagination —A.T. Quiller-Couch) (an able man, *licensed* by the times to do pretty much as he pleased —J.H.Hanford) **b** [MF *licencier,* fr. *licence,* n.] *archaic* **:** to give permission for departure to : DISMISS (thus *licensed,* the chief . . . left the presence chamber — Sir Walter Scott) **SYN** *see* AUTHORIZE

A-6

# Oxford English Dictionary | The definitive record of the English language

# license | licence, *v.*

**Pronunciation:** /ˈlaɪsəns/

**Forms:** ME–15 *lycence*, ME–15 **lycense**, **lysense**, (16 **lycens**), 18 *Sc.* **leeshance**, ME– **licence**, 15– ...

**Etymology:** < LICENCE *n.*, q.v. for the question of spelling. In sense **2**, < French *licencier*, < ...

**1.**

  **a.** *trans.* To give (a person) permission *to* (do something). Now *rare*. (In early use the personal obj. may be interpreted as *dat.*, and *occas.* appears preceded by *to*.)

    c1430  *Syr Gener.* (Roxb.) 2983   If it be your will to licence me to tel my tale.

    a1500 (1475)   G. ASHBY *Dicta Philosophorum* l. 739 in *Poems* (1899) 76   If ye be to any man licencyng To set his fote vpon youres areryng, He wol after set his fote vppon your nekke.

    1563  J. FOXE *Actes & Monuments* 1366/1,  I beseche your Lordshyp licence me to sytte downe.

    1577–87  R. HOLINSHED *Chron.* I. 175/2   The dead bodies of both armies are licenced to be buried.

    a1592  R. GREENE *Orlando Furioso* (1594) sig. Eᵛ,  King Marsillus licenst thee depart.

    1618  EARL SUFFOLK in *Fortesc. Papers* (Camden) 50   But I pray your Lordship to lycens me truly to acquaynt you what mesery yt hath produced unto me.

    a1639  W. WHATELY *Prototypes* (1640) I. xix. 212   To license ourselves to commit any sinne out of a conceit that it is small.

    1676  G. TOWERSON *Explic. Decalogue* 75   Our friendship with God··licenceth us to come with assurance.

    1684  J. BUNYAN *Pilgrim's Progress 2nd Pt.* II. 211   Therefore they were licensed to make bold with any of his things.

    1863  A. W. KINGLAKE *Invasion of Crimea* I. viii. 119   Lord Stratford was licensed to do no more than send a message to an Admiral.

  **b.** To permit (a thing) to be done; sometimes with *dat.* of the person. Now *rare*.

    1477  J. PASTON in *Paston Lett. & Papers* (2004) I. 501   The Pope will suffre a thyng to be vsyd, but he will nott lycence nor grant it to be vsyd ner don; and soo I.

    1561  T. NORTON tr. J. Calvin *Instit. Christian Relig.* (1634) I. xiii. 45   To attempt things not licenced.

    1563  J. FOXE *Actes & Monuments* 928/2   At the last I was contente to take it for lycenced, and so began to talke.

**A-7**

1598  R. GRENEWEY tr. Tacitus *Annales* III. ii. 66   Neuer shewing themselues more attentiue, nor at any time licencing themselues a more secret speech of the Prince.

1633  J. DONE tr. 'Aristeas' *Aunc. Hist. Septuagint* 99   Hee hath licensed vs eating the flesh of foure -footed beasts.

1861  M. PATTISON in *Westm. Rev.* **19** 410   A patent of Henry II · ·, in which he · ·licenses the sale of Rhenish wine at the same price as French is sold.

1869  R. BROWNING *Ring & Bk.* III. VIII. 116   If this were · ·Allowed in the Spring rawness of our kind, What may be licenced in the Autumn dry?

1869  R. BROWNING *Ring & Bk.* III. VIII. 123   The divorce allowed by Christ in lieu Of lapidation Moses licensed me.

†**c.** with *clause* as obj. *Obs.*

1398  J. TREVISA tr. Bartholomew de Glanville *De Proprietatibus Rerum* (1495) IX. xxvi. 363   It was lycencyd that seruauntes and wymmen and bestes shold reste in the Saturday.

1587  J. HOOKER *Chron. Ireland* 96/2 in *Holinshed's Chron.* (new ed.) II,   The governor licenced that it [the corps] should be buried.

†**2.**  [After French *licencier*.] To give leave of departure to; to dismiss, set free *from* (something); to send away *to* (a place). *Obs.*

1484  CAXTON tr. G. de la Tour-Landry *Bk. Knight of Tower* (1971) x. 24   The kyng thenne lycencyd them & gaf to them fair gyftes.

1551  R. ROBINSON tr. T. More *Vtopia* II. sig. Hviii,   Beynge then lycensed from the laboure of theyr owne occupacyons.

a1586  SIR P. SIDNEY *Arcadia* (1590) III. xiii. sig. Qq1ᵛ,   Amphialus licenced the Gentleman, telling him, by the next morning he should haue answere.

1591  R. SOUTHWELL *Marie Magdalens Funeral Teares* f. 62ᵛ,   Licence from thee that needles suspicion.

1598  R. BARRET *Theorike & Pract. Mod. Warres* IV. 103   He · ·comming vnto the companies, do licence them to their lodgings.

1603  J. FLORIO tr. Montaigne *Ess.* II. iii. 210,   I wil now departe, and licence the remainder of my soule [F. *donner congé aux restes de mon ame*].

1630  J. WADSWORTH *Eng. Spanish Pilgrime* 17   Tuesdayes and Thursdayes · ·on the after noones they are licensed to the recreation of the open fields.

1632  J. HAYWARD tr. G. F. Biondi *Eromena* 74   Having then taken instructions for the way, and licensed himselfe from the King, he set him forwards on his journey.

a1639  H. WOTTON *Parallel betweene Earle of Essex & Duke of Buckingham* (1641) 7   When hee listed he could licence his thoughts.

1676  DRYDEN *Aureng-Zebe* I. 10   Sir, you were pleas'd your self to license me.

1814  SCOTT *Waverley* II. xvii. 269   Thus licensed, the Chief and Waverley left the presence-chamber.

**A-8**

**3.**

**a.** To grant (a person) a licence or authoritative permission to hold a certain status or to do certain things, *e.g.* to practise some trade or profession, to hold a curacy, to preach, to use armorial bearings, to keep a dog, to carry a gun, etc. Const. *for*, *to*, and *to* with *inf*.

> *c*1400   *Rom. Rose* 7692,   I am licenced boldely In divinitee to rede.
>
> 1450–1530   *Myrr. our Ladye* 102   None oughte in holy chyrche to‥preche openly the worde of god but yf he be specially lycensed therto.
>
> ?*c*1450   *Life St. Cuthbert* (1891) l. 7598   And besoght his reuerence Þat he walde þaim lycence In his diocise to haue place.
>
> 1481   CAXTON tr. *Hist. Reynard Fox* (1970) 59,   I am lycensyd in bothe lawes.
>
> 1555   R. EDEN tr. Peter Martyr of Angleria *Decades of Newe Worlde* III. vii. f. 125,   Beyng therto lycenced by the kynge of Castile.
>
> 1638   *Penit. Conf.* (1657) viii. 277   So licensing them (as it were) for Priestly power.
>
> 1764   R. BURN *Hist. Poor Laws* 72   Poor folks licensed to beg out of the limits of any city or town corporate.
>
> 1796   J. MORSE *Amer. Universal Geogr.* (new ed.) I. 270   Licensing candidates for the ministry.
>
> 1828   M. R. MITFORD *Our Village* III. 178   Judith Kent, widow, 'Licenced'—as the legend imported, 'to vend tea, coffee, tobacco, and snuff.'
>
> 1830   J. GALT *Lawrie Todd* II. IV. ix. 78   Amos Bell‥had not been leeshanced above a week.
>
> 1878   R. SIMPSON *School of Shakspere* I. 23   The proclamation of July 8, 1557, licensing all English subjects to fit out ships to molest the French and Scots.
>
> 1901   *Durham Dioc. Cal.* 215   Curates licensed.

**b.** To grant a licence permitting (a house, theatre, etc.) to be used for some specified purpose.

> 1777   PARSONS *Let.* in *15th Rep. Royal Comm. Hist. MSS* (1896) App. I. 232   A petition‥for leave to bring in a bill to license a theatre at Birmingham.
>
> 1868   *Nat. Encycl.* I. 414   A constable may at all times enter licensed premises.
>
> 1874   J. C. BUCKNILL & D. H. TUKE *Man. Psychol. Med.* (ed. 3) 2   The College of Physicians, whose licensers were required to visit the houses which they had licensed.
>
> 1882   M. E. BRADDON *Mt. Royal* I. iii. 75   In which there is‥not even a cottage licensed for the sale of beer.

**4.**

**a.** To authorize the publication of (a book), or the acting of (a play).

> 1628   G. WITHER *Britain's Remembrancer* Pref. 279   Were my writing As true as that of holy Iohns inditing, They would not licence it.

**A-9**

> 1634   *Proc. Star Chamber* in S. Gardiner *Documents Proc. against W. Prynne* (1877) 23   Mr. Buckner did lycence 64 pages of the booke.
>
> 1644   MILTON *Areopagitica* 7   That no Book··should be Printed··unlesse it were approv'd and licenc't under the hands of 2 or 3 glutton Friers.
>
> 1667   M. POOLE *Dialogue between Popish Priest & Protestant* 155   Books Licensed by the Approbation··of your Church.
>
> 1858   HALLIWELL *Dict. Old Plays* 264   This play was licensed on June 6th, 1634.

†**b.** To vouch for. *Obs. rare.*

> 1694   R. BURTHOGGE *Ess. Reason* 216   A Story Licensed by a Person of Quality and of Great worth.

**5.** To allow liberty, free range, or scope to; to privilege, tolerate. *Obs.* exc. in *ppl. adj.*

> 1605   BACON *Of Aduancem. Learning* II. sig. Ee1ᵛ,   Poesie is··in measure of words for the most part restrained: but in all other points extreamely licensed.
>
> 1640   LD. J. DIGBY *Speech in Comm.* 9 Nov. 4,   I shall··with your Permission licence my Thoughts too, a little.
>
> 1704   R. STEELE *Lying Lover* I. 9   Licence my innocent Flames, and give me leave to love such charming Sweetness.

---

license | licence, v.

Second edition, 1989; online version March 2012. <http://www.oed.com/view/Entry/107946>; accessed 21 March 2012. Earlier version first published in *New English Dictionary*, 1902.

Oxford University Press
Copyright © 2012 Oxford University Press . All rights reserved.

Your access is brought to you by:
Covington %26 Burling Library