**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
TOTO, INC.,

                Plaintiff,

v.                                           12 Civ. 1434 (RJS) (AJP)

SONY MUSIC ENTERTAINMENT,         ECF CASE

                Defendant.
--------------------------------------------------------X

## DEFENDANT SONY MUSIC ENTERTAINMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018

*Attorneys for Defendant*
*Sony Music Entertainment*

Table of Contents ............................................................................................... i

Table of Authorities ......................................................................................... iii

Preliminary Statement ....................................................................................... 1

Statement of Facts ............................................................................................. 3

    A.    The 1977 and 1983 Agreements. ........................................................ 3

    B.    The Parties' Course of Performance Under the Recording Agreements. ............... 6

    C.    The 1986 Amendment. ....................................................................... 7

    D.    The 2002 Amendment. ....................................................................... 8

    E.    SME's Relationship with Apple, Inc. and Other Download Retailers. ................. 9

    F.    SME's Royalty Accounting for Digital Downloads. ........................... 10

    G.    Toto's 2010 Audit Claim. ................................................................. 11

Procedural History ........................................................................................... 12

Argument ......................................................................................................... 14

I.    The Audiophile Provision Unambiguously Precludes Toto's Claim. ............... 15

    A.    The Audiophile Provision Governs the Sale of Downloads. ............... 15

    B.    The Language of the Agreements Refutes All of Toto's Contrary Arguments. ................................................................................ 16

II.    Even in the Absence of the Audiophile Provision, the Lease Provision Would Not Apply to Sales of SME Record Releases. ........................... 20

    A.    In the Absence of the Audiophile Provision, the NRC Provision Would Apply. ....................................................................... 21

    B.    The Plain-Language Meaning of "Lease" Is Not Synonymous With License and Does Not Apply to Rights in Intellectual Property. ............... 22

    C.    As Used In the Recording Industry the Term "Lease" Refers Solely to a License for Use of a Recording in a Third-Party Product. ............... 24

    D.    The Structure of the Agreements Confirms that the Lease Provision Does Not Apply to SME Record Releases. ............................ 26

III.     All the Extrinsic Evidence Shows that the Lease Provision Does Not Apply to
         SME Downloads. ........................................................................................................ 26

         A.       The Parties' Course of Performance. ................................................... 26

         B.       The Drafters' Intent. ............................................................................. 28

         C.       Industry Custom and Practice. ............................................................. 29

IV.      SME Sells Downloads to Apple For Resale to Consumers. ........................................ 31

V.       SME Is Entitled to Summary Judgment on its Declaratory-Judgment
         Counterclaim. .............................................................................................................. 33

Conclusion ................................................................................................................................. 35

TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*2619 Realty, LLC v. Fidelity & Guaranty Insurance Co.*,
   756 N.Y.S.2d 564 (App. Div. 2003) ........................................................................22

*Allman v. Sony BMG Music Entertainment*,
   2008 WL 2477465 (S.D.N.Y. June 18, 2008) ........................................................21

*Arch Ins. Co. v. Precision Stone, Inc.*,
   584 F.3d 33 (2d Cir. 2009) .....................................................................................23

*In re Avon Securities Litigation*,
   2004 WL 3761563 (S.D.N.Y. Mar. 29, 2004) ........................................................28

*Bekhor v. Bear, Stearns & Co., Inc.*,
   2004 WL 2389751 (S.D.N.Y. Oct. 25, 2004) .........................................................18

*Bentley v. Textile Banking Co.*,
   271 N.Y.S.2d 417, 418-9 (App. Div. 1966) ...........................................................23

*Christopher v. SmithKline Beecham Corp.*,
   132 S.Ct. 2156 (2012) .............................................................................................19

*Dalton v. Educational Testing Service*,
   639 N.Y.S.2d 977 (N.Y. 1995) ...............................................................................34

*Dedyo v. Baker Engineering New York, Inc.*,
   1998 WL 9376 (S.D.N.Y. Jan. 13, 1998) ...............................................................33

*Dobrova v. Holder*,
   607 F.3d 297 (2d Cir. 2010) ...................................................................................22

*Export-Import Bank of U.S. v. Asia Pulp & Paper Co.*,
   609 F.3d 111 (2d Cir. 2010) ...................................................................................22

*F.B.T. Products, LLC v. Aftermath Records*,
   621 F.3d 958 (9th Cir. 2010) ..................................................................................16

*Franconero v. Universal Music Group*,
   Order, No. 2:12-cv-03382, Dkt. 61 ........................................................................19

*Greenfield v. Philles Records*,
   750 N.Y.S.2d 656 (N.Y. 2002) ..........................................................................14, 31

*Hunt v. Commissioner*,
   938 F.2d 466, 469 (4th Cir. 1991) ..........................................................................23

*India.com v. Dalal*,
    412 F.3d 315 (2d Cir. 2005)............................................................................23

*Jobim v. Songs of Universal, Inc.*,
    732 F. Supp. 2d 407 (S.D.N.Y. 2010)......................................................27, 29

*Keifer v. Sony Music Entertainment, Inc.*,
    778 N.Y.S.2d 496 (App. Div. 2004)...........................................................34

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    133 S. Ct. 1351 (2013)................................................................................23

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010)..................................................................14, 24

*Malmsteen v. Universal Music Grp., Inc.*,
    940 F. Supp. 2d 123 (S.D.N.Y. 2013)......................................18, 19, 21, 22

*Murphy v. American Home Products Corp.*,
    461 N.Y.S.2d 232, 237 (N.Y. 1983).........................................................34

*N.Y. Marine and General Insurance Co. v. LaFarge North America, Inc.*,
    599 F.3d 102 (2d Cir. 2010)..................................................................15, 26

*NFL Enterprises LLC v. Comcast Cable Communications, LLC*,
    851 N.Y.S.2d 551 (App. Div. 2008)..........................................................23

*Patterson v. County of Oneida, N.Y.*,
    375 F.3d 206 (2d Cir. 2004)......................................................................33

*Peconic Baykeeper, Inc. v. Suffolk County*,
    600 F.3d 180 (2d Cir. 2010)......................................................................22

*Popkin v. Security Mutual Insurance Co. of N.Y.*,
    367 N.Y.S.2d 492 (App. Div. 1975)..........................................................26

*Record Club of America, Inc. v. United Artists Records, Inc.*,
    1991 WL 73838 (S.D.N.Y. Apr. 29, 1991)...............................................27

*Recording Industry Association of America v. Diamond Multimedia Systems, Inc.*,
    180 F.3d 1072 (9th Cir. 1999) ....................................................................8

*United States v. Bunn*,
    2013 WL 5779032 (2d Cir. Oct. 28, 2013)...............................................22

*United States v. Zafar*,
    291 F. App'x 425 (2d Cir. 2008) ..............................................................22

*Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*,
    973 N.Y.S.2d 187 (App. Div. 2013) .......................................................................16

*Zurich Ameican Insurance Co. v. ABM Indus. Inc.*,
    397 F.3d 158 (2d Cir. 2005).......................................................................19, 20

**Federal Rules**                                          **Page(s)**

FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6) ........................................................27, 28, 29, 32

FEDERAL RULE OF EVIDENCE 804(b)(1) ...........................................................................33

**Other Authorities**                                       **Page(s)**

*Apple Launches the iTunes Music Store*
    Apr. 28, 2003, *available at* https://www.apple.com/pr/library/
    2003/04/28Apple-Launches-the-iTunes-Music-Store.html ......................................................9

BLACK'S LAW DICTIONARY .......................................................................................22, 23

GENERAL COUNSEL MEMORANDUM 39111
    IRS Sec(s). 48, Jan. 4, 1984 ...........................................................................23

OXFORD ENGLISH DICTIONARY ......................................................................................22

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY .........................................................22, 23

In 2002—by which time music was being sold in the form of digital downloads—plaintiff Toto, Inc. and defendant Sony Music Entertainment ("SME") amended their recording agreements to change the way SME would pay Toto on digital records. The amendment set forth a new royalty rate for sales of "Audiophile Records," which were defined to include "all forms of reproduction now or hereafter known" that are "made for digital playback." In order to preclude any argument that this provision was qualified by other royalty provisions of the agreement, the parties indicated that the amendment would apply "[n]otwithstanding anything to the contrary contained in" the existing royalty provisions.

In 2004, SME began paying Toto royalties from sales of digital downloads through retailers such as iTunes. SME accounted for such sales at the royalty rate for Audiophile Records from the outset. In 2006, Toto completed an audit of SME's royalty accounting for 2004. Consistent with the plain language of the 2002 amendment, Toto did not object to SME's application of the Audiophile rate to download sales by iTunes or any other retailer.

Toto now contends that the Audiophile rate doesn't apply to downloads after all. Toto argues that (i) SME has licensed Toto's master recordings to Apple and other digital retailers for sale as downloads, and (ii) because SME allegedly does not sell the records itself, SME owes Toto a substantially higher royalty under a provision in the parties' original agreements applicable to "leases" of Toto's master recordings. But Toto does not identify anything in the language of the 2002 Amendment that would justify this result. Instead, Toto argues that the 2002 Amendment incorporates the royalty distinctions that were drawn in the parties' agreements *before* the amendment. In doing so, Toto ignores the "notwithstanding" provision contained in the 2002 Amendment, which its brief never discusses.

Toto also contends that, in resolving SME's motion to dismiss, Judge Kaplan "ruled" that "the language of the agreements, taken as a whole, suggests that the Audiophile Provision applies only to Sony's direct sales." But the passage Toto quotes comes from Judge Kaplan's recitation of reasons why "*Toto contends* that [the Audiophile Provision] does not apply here." (Dkt. 8 at 3 (emphasis added)). Judge Kaplan expressly declined to rule on the proper construction of the Audiophile Provision, stating that "the Court is not yet in a position to make even the threshold determination whether the Audiophile Provision is unambiguous." (*Id.* at 4). The Court now is in that position, and the Audiophile Provision's plain terms—which apply to all sales of all forms of reproduction made for digital playback—control.

Even if the Court could disregard the Audiophile royalty provision (and even assuming SME licensed Apple to sell downloads, which we demonstrate below is not the case), Toto's claim would still fail. Sales of Toto downloads fall within the plain terms of ¶ 9.01(a), which is the basic royalty provision applicable to sales "by SME or its Licensee" through "Normal Retail Channels"—as this Court has twice held with respect to similar claims by other recording artists under substantially similar contracts. Toto's position that the royalty provision applicable to "leases" would govern instead has no support in the contract's plain meaning or in the terminology of the recording industry. The word "lease" is not, as Toto asserts, synonymous with "license," and it does not refer to intellectual property rights. Moreover, the evidence of industry usage uniformly shows that "lease" refers exclusively to a license to a third party to use a master recording in its own product, such as a third-party "best of" compilation record. It does not apply to a license to make and sell copies of records released and marketed by SME.

SME respectfully requests that the Court enter summary judgment in SME's favor.

STATEMENT OF FACTS

A.    *The 1977 and 1983 Agreements.*

In 1977, Toto entered into a recording contract with CBS Records, SME's predecessor in interest.[1]  Pursuant to that contract, Toto agreed to record and deliver musical performances ("master recordings" or "masters") to SME.  (Toto Ex. B ¶ 3).[2]  These masters became the "sole property" of SME, and SME has the "unlimited" right to exploit or "to refrain from" exploiting them.  (*Id.* ¶¶ 7.01–7.02).  In exchange, SME agreed to pay Toto royalties on various exploitations of those masters (*e.g.*, *id.* ¶ 9), and to advance hundreds of thousands of dollars to Toto (*id.* ¶ 6).  The agreement contains a New York choice-of-law provision.  (*Id.* ¶ 20.06).

The royalty rates are set out in Article 9.  The opening paragraph of Article 9, ¶ 9.01, contains two subparts.  It begins with an overarching royalty provision, ¶ 9.01(a), that applies to Toto records sold through normal retail channels (the "NRC Provision"):

> [SME] will pay you a basic royalty as follows in respect of Net Sales of Phonograph Records *consisting entirely of Master Recordings* performed by the Artist and recorded hereunder and *sold by [SME] or its Licensee* Through Normal Retail Channels for distribution in the United States . . . .

(*Id.* (emphasis added)).  The rate applicable to normal retail channel sales outside the United States is set forth in ¶ 9.06, which states:

> The basic royalty under paragraph 9.01 on Phonograph Records *sold by [SME] or its Licensees* for distribution outside of the United States of America shall be computed at the applicable percentage indicated below: . . . .

(*Id.* ¶ 9.06 (emphasis added)).  The agreement broadly defines "Phonograph Records" and "Records" to include "all forms of reproductions, now or hereafter known."  (*Id.* ¶ 14.05).  The

---

[1]    This memorandum refers to SME and its predecessors, including CBS Records, as "SME."

[2]    This memorandum cites to the parties' agreements attached as Exhibits B through E to Toto's submission.  SME previously submitted authenticated versions of these agreements.  (*See* Dkt. 5 and 5-1 through 5-4).

agreement imposes no limit on the scope of the term "Licensees"; the term "includes, *without limitation*, subsidiaries, wholly or partly owned, and other divisions of [SME]." (*Id.* ¶ 14.19) (emphasis added).

Paragraph 9.01(a) is the agreement's primary royalty provision and was the focus of the parties' negotiations. (Curran Decl. Ex. A, 260:20–261:18). The attorney that drafted the agreement intended that this provision would apply to SME's principal business—the sale through mainstream retail outlets of SME's own products created from the Toto masters—regardless of who sold those records. (*Id.* Ex. B, 18:25–19:7, 42:15-24, 47:13–23). Toto's attorney who negotiated on its behalf agreed that ¶ 9.01 sets the royalty rates for sales of SME record releases in the United States. (Curran Decl. Ex. R 29:24–30:3). Industry custom similarly is for a recording contract's basic NRC provision to apply to sales of the record company's releases, regardless of who sells them. (Ritholz Decl. Ex. A, 11).

The second subpart of ¶ 9.01—¶ 9.01(b)—sets forth a reference royalty rate included solely for the purpose of calculating royalties under other provisions in the agreement, many of which express the applicable royalty as a percentage of the "otherwise applicable" rate. (*E.g.*, Toto Ex. B ¶¶ 9.02; 9.05).

Among these other royalty provisions is ¶ 9.03, which provides rates for a variety of exploitations that are ancillary to SME's principal business of selling its own record releases through normal retail channels:

> In respect of catalog Phonograph Records sold by CBS' special products operations (hereinafter, "CSP") to educational institutions or libraries or to other CSP clients for their promotion or sales incentive purposes (but not for sale to the general public through normal retail channels), the royalty shall be one-half (l/2) of the royalty rate otherwise payable. In respect of non-catalog Phonograph Records created on a custom basis for clients of CSP, the royalty rate shall be one-half (1/2) of the royalty rate otherwise payable and shall be computed on the basis of CSP's actual sales price therefor (less all taxes and container charges). In

respect of any Master Recording leased by CBS to others for their distribution of Phonograph Records in the United States, CBS will pay you 50% of CBS' net receipts therefrom after deduction of all copyright, AFM and other applicable third party payments . . . .

(*Id.* ¶ 9.03).

The attorney who drafted both the 1977 Agreement and the standard form contract from which ¶ 9.03 was drawn, Andrew Gerber, testified that ¶ 9.03 was known as the "Special Products" paragraph. (Curran Decl. Ex. B, 20:10–20; 43:5–9). It was intended to cover the activities of SME's Special Products Division, which was responsible for non-mainstream uses of master recordings; each of the paragraph's three sentences therefore corresponds to one of the three primary functions of that division. (*Id.*, 20:10–21:25; 23:8–24:6). The third sentence of ¶ 9.03 (the "Lease Provision") corresponds to the Special Products function of authorizing a third party to incorporate an SME master recording into that third party's own product, such as a compilation record. (*Id.* 34:10–35:22; 99:12–100:22; 115:19–116:18; *id.* Ex. A, 260:20–261:18; *see also* Tyrrell Decl. ¶ 11, 22). Gerber expressed this specialized application by using the term "lease," an industry term of art that refers solely to a license permitting a third party to use a master recording in its own product. (Curran Decl. Ex. B, 115:19–116:18; 99:19–100:9; Tyrrell Decl. ¶¶ 11, 25–26; Curran Decl. Ex. A, 260:20–261:18).

No part of ¶ 9.03 was intended to apply to sales of SME's own record releases through normal retail channels. (Curran Decl. Ex. B, 46:17–25, 43:5–9; *id.* Ex. R 48:12–25 (testimony of Toto's negotiating attorney that the "50 percent of net receipts royalty rate was not understood to apply . . . to sales of a record company's own albums or singles through record stores" because the "rate of 50 percent of net receipts would not apply to sales through normal retail channels"); *see* Tyrrell Decl. ¶ 28). Consistent with that fact, industry custom is that provisions for payment of 50% of the record company's net receipts—like ¶ 9.03—apply only to third-party products,

and not to sales of the record company's own products by licensees. (Ritholz Decl. Ex. A, 9–10). Fifty percent of net receipts was intended to yield a reduced royalty on such third-party products as compared to application of the artist's NRC rate. (Curran Decl. Ex. B, 28:8–30:6; Ex. S, 1 at ¶ 1; Ritholz Decl. Ex. A, 9–10; *see* Tyrrell Decl. ¶ 28).

In January 1983, the parties executed a second recording contract (the "1983 Agreement"), which was substantially similar to the first. Like the 1977 Agreement, the 1983 Agreement obligated Toto to record and deliver masters, which became "the sole property of [SME]." (*See* Toto Ex. C ¶¶ 7.01; 7.02). Paragraph 9.01(a) of the 1983 Agreement contains the primary royalty rates. Paragraph 9.01(b) contains a reference rate for the purpose of calculating royalties under other provisions. Paragraph ¶ 9.03 contains special-products rates identical to the corresponding rates in the 1977 Agreement.

**B.** ***The Parties' Course of Performance Under the Recording Agreements.***

From 1977 forward, the parties' course of performance under the recording agreements was consistent with the royalty provisions' plain language, the draftsmen's stated intent, and industry custom. SME routinely paid Toto at the rates in ¶ 9.01(a) or ¶ 9.06 for sales of SME's record releases, regardless of whether manufactured and sold by SME, by an SME affiliate under license, or by a licensee that was not a corporate affiliate of SME. (Zotian Decl. ¶¶ 11-12, 19-21). For example, in certain foreign territories, such as Italy and the United Kingdom, SME licensed affiliated companies to sell Toto records, while in other territories, such as Israel, Jamaica, the Philippines, and Saudi Arabia, Toto records were manufactured and sold under license by third parties unaffiliated with SME. (Bondell Decl. ¶¶ 9, 12, 16, 30).[3] SME accounted to Toto for all such sales under ¶ 9.06 and not under the foreign lease provision in

---

[3]      Examples of such records accompany the declaration of Stuart Bondell. *See* Bondell Decl. Exs. C, D, E.

¶ 9.07. (*Id.* ¶ 31; Zotian Decl. ¶¶ 19–21). Toto never objected to this practice. (Zotian Decl. ¶ 22).

SME also issued *ad hoc* licenses to third parties to use particular Toto masters in the third parties' own products. For instance, it granted a license allowing Warner Special Products to include the Toto master "Rosanna" in a compilation entitled *Billboard Top Hits 1982*. (Tyrrell Decl. ¶ 22; *see id.* Ex. C). SME accounted for revenue generated by such uses under the Lease Provision. (Zotian Decl. ¶ 9).

**C.      *The 1986 Amendment.***

By the mid-1980s, a variety of new digital formats for recorded music either had been introduced or were under development, including compact discs, digital compact cassettes, and digital audiotapes. (Ritholz Decl. Ex. A, 8). In August 1986, SME and Toto executed a contract that amended the 1983 Agreement by, among other things, setting a royalty rate applicable to sales of SME's record releases in digital formats (the "1986 Amendment").

The 1986 Amendment implemented this new rate by introducing a new defined term, "Audiophile records," and establishing a royalty rate applicable to Audiophile Records. The amendment defines "Audiophile records" as:

> Records (other than audiovisual Records) marketed in specially priced catalog series by reason of their superior sound quality or other distinctive technical or artistic characteristics (*all Records made for digital playback are Audiophile records*), and the term "standard records" shall mean Records other than Audiophile Records and audiovisual Records.

(Toto Ex. E ¶ 3(b) (emphasis added)). The royalty provision states:

> Notwithstanding any provision of the Agreement to the contrary, the royalty on an 'Audiophile record' (as such term is defined in this paragraph 3) will be . . . . seventy-five percent (75%) of the applicable minimum royalty rate prescribed in subparagraph 9.01(b) of the Agreement . . . .

(*Id.* ¶ 3(a)).

Following this amendment, SME accounted to Toto under this royalty provision for records released by SME and sold in formats made for digital playback—including sales by unaffiliated licensees of SME record releases in the form of compact discs.  (Zotian Decl. ¶¶ 13–15).

**D.    *The 2002 Amendment.***

In the late 1990s, online distribution of music began to proliferate.  *See generally Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1074 (9th Cir. 1999).  Thus, by 2002, the industry shift to commercial distribution of music in the form of digital downloads was already well underway.  (Curran Decl. Ex. C,  246:23–247:11;  Wood Decl. ¶ 3).

That year, the parties again amended their recording agreements (the "2002 Amendment").  The 1986 amendment had applied the "Audiophile Records" definition and corresponding royalty rate solely to masters recorded under the 1983 Agreement.  The 2002 Amendment extended those concepts to Toto masters recorded under the 1977 Agreement, and increased the rate from 75% to 80% of the basic rate in ¶ 9.01(b):

> Notwithstanding anything to the contrary contained in Article 9 of the 1977 Agreement and solely with respect to sales after December 31, 1998 of Audiophile Records released under either of the Agreements, the royalty rate on such Records shall be eighty percent (80%) of the royalty rate specified in subparagraph 9.01(b) of the 1983 Agreement . . . .

(Toto Ex. D ¶ 4(a), the "Audiophile Provision").

The initial draft of the 2002 Amendment referred only to sales of records "embodied on a digital compact disc," rather than to "Audiophile Records."  (Harrison Decl. ¶ 7).  At Toto's request, the parties revised the provision to instead encompass all "Audiophile Records released under either of the Agreements."  (*Id.*; Toto Ex. D. ¶ 4(a); Wood Decl. ¶ 4).  Toto's deal lawyer testified that the change was made to ensure that ¶ 4(a) applied to sales of all records made for

digital playback, not just to CDs. (Harrison Decl. ¶ 7). SME similarly intended the provision to apply to all SME record releases made for digital playback, including downloads in particular. (Wood Decl. ¶ 5).

Thus, as of February 2002, ¶ 4(a) of the 2002 Amendment is the royalty provision that governs "sales . . . of Audiophile Records released under either of the Agreements."

### E.    *SME's Relationship with Apple, Inc. and Other Download Retailers.*

In response to the advent of digital distribution, SME began to make individual tracks available as products in its catalog of currently available record releases. Since 2003, each individual SME track available for digital download is identified as a separate product, with its own individual SKU number. (Walker Decl. ¶ 31).

In April 2003, Apple announced the launch of the iTunes Music Store, which it described as "a revolutionary online music store."[4]

---

[4]    "Apple Launches the iTunes Music Store," Apr. 28, 2003, *available at* https://www.apple .com/pr/library/2003/04/28Apple-Launches-the-iTunes-Music-Store.html.

The Amazon website and the order confirmation information provided to the consumer expressly state that downloads containing SME masters are "Sold by SONY Music Entertainment Downloads LLC." (*Id.* ¶¶ 17–18).

Online record stores have replaced physical stores as the primary retail channel through which consumers purchase music in the United States. For instance, since at least 2008, Apple has sold more SME records annually than any other retailer, digital or physical. (Walker Decl. ¶ 5).

**F.**     *SME's Royalty Accounting for Digital Downloads.*

Toto's June 2004 royalty statement was the first to include royalty payments for digital downloads. (Zotian Decl. ¶ 32). Consistent with the plain language of ¶ 4(a) of the 2002 Amendment, SME accounted to Toto for downloads, including those sold by iTunes, at the royalty rate for Audiophile Records. (*Id.* ¶ 33).

In 2006, Toto audited SME's semi-annual royalty accounting for the periods ending in June and December 2004. (*See* Curran Decl. Ex. P, 9 at ¶ 12). As Toto acknowledged in discovery, SME's application of the Audiophile Provision to sales of digital downloads was evident on the face of the royalty statements that SME issued to Toto for those two periods and for every semi-annual period thereafter through the time of the audit. (Curran Decl. Ex. C,

190:4–19; *see* Zotian Decl. ¶ 34).  At the conclusion of the audit, Toto did not object to SME's

application of the Audiophile royalty rate to downloads.  (Curran Decl. Ex. P, p. 9 at ¶ 13).[5]

### G.   *Toto's 2010 Audit Claim.*

In 2008, Toto began auditing SME's royalty accounting for the June 2006 through June

2008 reporting periods.  (Curran Decl. Ex. M).  The audit was conducted by Haber Corporation.

Haber Corp.'s owner, Gary Haber, is an officer of Toto, Inc.  (*Id.* Ex. C, 86:17–23).

In March 2010, Haber Corp. submitted its audit report.  In it, Toto asserted for the first

time—almost seven years after iTunes launched—that royalties on digital downloads "should be

50% net receipts."  (*See id.* Ex. M, 5).  In August 2010, SME responded to Toto's audit report.

(Toto Ex. M, 1).[6]  Toto has asserted that SME did not raise the Audiophile royalty provision in

this response (*see* Toto Br. 2–3, 14; Dkt. 78, 25:1–8), but the document speaks for itself:

> Permanent digital downloads qualify as Audiophile records as defined in the
> agreement.  Accordingly, permanent digital downloads should be paid on the
> same basis as all other audiophile records (e.g. compact discs).

(Toto Ex. M, 9).

After receiving SME's March 2010 response, the accountant who principally conducted

Toto's audit, J.D. McAlpine, initially accepted that the Audiophile rate applied.  (Curran Decl.

Ex. E, 124:11–125:17).  Mr. McAlpine prepared a revised audit schedule indicating that SME

had *overpaid* Toto on downloads by $42,005.71.  (*Id.* Ex. K, TOTO_SUPP00269706-7).  Mr.

---

[5]     Beginning in 2007, SME transitioned from its prior accounting software, GRS, to a more
sophisticated system, EROS.  (Zotian Decl. ¶ 24).  Due to errors resulting from the migration of
accounts between the systems, SME mistakenly failed to apply the Audiophile royalty rate to
both CDs and downloads for several royalty periods following the transition.  (*Id.* ¶¶ 24-25).  As
a result, SME overpaid Toto for certain sales by applying the full NRC rate.  (Zotian Decl. ¶¶ 26,
36).  Toto's auditor acknowledged this was an error, rather than evidence of SME's intent with
respect to the Audiophile rate.  (Curran Decl. Ex. E, 110: 3–7).

[6]     A version of this document was authenticated by John D. McAlpine during his
deposition.  (See Curran Decl. Ex. E, 72:12–73:4).

McAlpine informed his boss, Gary Haber, that this schedule was the final "top level settlement schedule" that should "go to Sony." (*Id.*, TOTO_SUPP00269705).

In response, Mr. Haber asked, "Are we claiming 50% on downloads?" (*Id.* Ex. L, TOTO_SUPP00269669). Mr. McAlpine replied, "No, *their agreement stipulates how to pay downloads*. Basically like CD's." (*Id.* (emphasis added)). Mr. McAlpine later added, "They called it audiophile records," which, he wrote, includes "all records made for digital playback." (*Id.*, TOTO_SUPP00269668).

Mr. Haber replied that "I don't think they can say this covers digital transmissions. I want to claim 50% of downloads and streaming." (*Id.*). Consequently, in its April 2011 rebuttal to SME's audit response, Toto stated, "[W]e do not accept that digital downloads *are audiophile records*." (*Id.* Ex. N, TOTO_SUPP00000189 (emphasis added)). Toto did not contend that, to the extent downloads *are* Audiophile Records, the Audiophile royalty provision would not apply to iTunes sales. Indeed, during discovery, Mr. Haber confirmed his view that the Audiophile royalty provision applies to sales of SME records through iTunes so long as downloads are Audiophile Records:

> Q. Well, sitting here right now, other than digital downloads not constituting audiophile records, are you aware of any reason why the royalty provision in paragraph 4(a) would not apply to digital downloads, even if they are leased?
>
> A. I am not.

(*Id.* Ex. C, 331:3–9).

### PROCEDURAL HISTORY

Toto commenced this action on February 27, 2012, and it was originally assigned to Judge Kaplan. (Dkt. 1). The complaint claimed principally that SME breached the Toto Agreements by failing to calculate royalties on sales of music downloads, mastertones, and ringtones pursuant to the Lease Provision in the 1977 and 1983 Agreements. (Dkt. 1 ¶¶ 21–23,

29–33).  In support of this claim, Toto alleged that digital retailers such as Apple have "licensed" Toto's master recordings from SME, and that "leased" is "Sony's parlance" for "licensed." (*Id.* ¶ 21; *see also id.* ¶ 28 (referring to download providers as "licensees")).

With respect to the Audiophile royalty provision, the complaint did not dispute that downloads are "Audiophile Records," as had Toto's audit rebuttal.  Instead, it alleged that "[t]he Audiophile Provision is only applicable to sales by Sony or Sony's Principal Licensee." (*Id.* ¶ 30).  "Principal Licensee" is not a defined term in the parties' agreements.  Rather, Toto alleged that "Principal Licensee" is a "term of art which refers <u>only</u> to Sony's subsidiary or partner that manufactures and distributes phonorecords in a certain foreign territory in which Sony, itself, does not manufacture or distribute Phonograph Records," and that "Principal Licensees are a separate and distinct class from the type of third-party licensees that encompass Music Download and Mastertone Providers." (*Id.* ¶¶ 31–32 (emphasis in original)).

SME moved to dismiss Toto's complaint on March 22, 2012.  (Dkt. 3).  On April 23, 2012, Judge Kaplan granted the motion in part, but denied it with respect to Toto's download claim.  (Dkt. 8).  Judge Kaplan did not rule that the 2002 Amendment is ambiguous.  Instead, the order states:

> In all the circumstances, the Court is not yet in a position to make even the threshold determination whether the Audiophile Provision is unambiguous. It certainly is not in a position to decide, even assuming that it is unambiguous, what its unambiguous meaning may be.

(*Id.* at 4).

Toto then amended its complaint.  (Dkt. 20).  SME moved to dismiss all of the claims in the Amended Complaint other than the download claim as to certain periods, (Dkt. 21), and the motion was granted by Judge Sullivan on January 15, 2013, (Dkt. 46, adopting R&R, Dkt. 43).

As a result, Toto's only surviving claim is for download royalties for the December 2008 through December 2011 royalty periods. (Dkt. 64).

**ARGUMENT**

"Despite the technological innovations that continue to revolutionize the recording industry, long-settled common-law contract rules still govern the interpretation of agreements between artists and their record producers." *Greenfield v. Philles Records*, 750 N.Y.S.2d 656, 569 (N.Y. 2002). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.*

"[T]he initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (citation and internal quotation marks omitted). Here, the disputed question is which royalty provision applies to sales of SME's own record releases through Apple's iTunes Store.[7] Toto contends that (i) SME has licensed Toto's sound recordings to Apple for sale as downloads, and (ii) that royalties on such sales must be calculated under the Lease Provision.

SME is entitled to summary judgment on Toto's claim for four reasons. *First*, the royalty rate for Audiophile Records unambiguously applies to all sales of records made for digital playback, including downloads. This straightforward provision disposes of the lawsuit.

*Second*, even if somehow the Audiophile Provision did not cover iTunes sales, the NRC Provision—which unambiguously applies to sales by SME or its licensees—would govern. The Lease Provision does not apply to sales of SME record releases—regardless of who sells them.

---

[7]     Toto's motion refers generally to "unaffiliated third party Music Download and Mastertone Providers." (*See* Toto Br. 1, 6). However, those terms are not defined in Toto's motion or in the Amended Complaint, and Toto's motion does not refer to any specific digital retailer other than Apple.

*Third*, "the extrinsic evidence illuminating the parties' intended meaning of the contract is so one-sided that no reasonable person could decide" in Toto's favor even were the agreements ambiguous on their face. *N.Y. Marine and Gen. Ins. Co. v. LaFarge N. Am., Inc.*, 599 F.3d 102, 115 (2d Cir. 2010) (citation and internal quotation marks omitted). The parties' course of performance reflects their understanding that the Audiophile royalty rate applies to downloads of SME record releases, and that the NRC rate applies to sales of non-Audiophile records released by SME.

*Fourth*, Toto's case is predicated entirely on the assertion that SME licenses Apple to sell SME digital downloads. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

SME is also entitled to summary judgment on its counterclaim for a declaratory judgment that SME is not obligated to distribute Toto downloads through any particular retailer, as the agreements explicitly grant SME the unfettered right to refrain from distributing Toto records.

## I.     The Audiophile Provision Unambiguously Precludes Toto's Claim.

### A.     *The Audiophile Provision Governs the Sale of Downloads.*

Toto's claim for fifty percent of SME's net receipts on downloads is foreclosed by ¶ 4(a) of the 2002 Amendment, even assuming *arguendo* that SME licenses Apple to sell downloads.

To start, downloads are "Audiophile Records." The parties' agreements state that "all Records made for digital playback are Audiophile records," and "Records" is defined to include "all forms of reproduction now or hereafter known . . . ." (Toto Ex. E ¶ 3(b); Toto Ex. C ¶ 14.05). Toto's brief does not dispute that downloads are Audiophile Records, nor could it reasonably do so.

Paragraph 4(a) of the 2002 Amendment, in turn, specifies the royalty rate "with respect to sales after December 31, 1998 of Audiophile Records released under either of the [1977 or 1983] Agreements." It does not differentiate between sales by SME or by its licensees, and Toto's Amended Complaint alleges that the provision is *not* limited to direct sales by SME. (Dkt. 20 ¶¶ 70–72). Toto's brief acknowledges that Apple "sell[s] permanent downloads." (Toto Br. 22). Thus, by its plain terms, the Audiophile Provision applies to iTunes sales.

Moreover, the Audiophile Provision applies "[n]otwithstanding anything to the contrary" in any other royalty provision. (Toto Ex. D ¶ 4(a)).[8] "It is well settled that trumping language such as a 'notwithstanding' provision controls over any contrary language in a contract." *Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*, 973 N.Y.S.2d 187, 191 (App. Div. 2013) (citation and internal quotation marks omitted); *see also F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 964 (9th Cir. 2010) (holding that "[t]he parties' use of the word 'notwithstanding' plainly indicates that even if a transaction arguably falls within the scope of" another royalty provision of the agreement, the provision following the word "notwithstanding" applies). Thus, whether iTunes sales would be covered by the Lease Provision absent the 2002 Amendment is irrelevant.

**B.**     ***The Language of the Agreements Refutes All of Toto's Contrary Arguments.***

In its initial responses to SME's Requests for Admission, Toto reiterated its position that "[t]he term 'Licensees' as used in the Agreements refers only to Sony's Principal Licensees in foreign territories who are *either* affiliates of Sony *or* sell Sony's physical product in foreign territories where Sony does not have a subsidiary or affiliate." (Curran Decl. Ex. O at. 9 ¶ 17 (emphasis added)).

---

[8]     The 1986 Amendment similarly stated the Audiophile royalty rate applied "[n]othwithstanding any provision of the Agreement to the contrary." (Toto Ex. E ¶ 3(a)).

Toto now asserts, however, that (i) the Audiophile Provision is limited to sales by "SME and its Licensees," and (ii) the term "Licensees" is limited to corporate affiliates of SME.[9] None of the arguments Toto offers is supported by the language of the agreements.

*First*, Toto contends that the Audiophile Provision applies only to sales by "SME and its Licensees" because the provision "solely referenc[es] the rate found in paragraph 9.01." (Toto Br. 24). Toto's argument is a non sequitur. The Audiophile Provision's use of a *rate* found in paragraph 9.01 as a benchmark in no way implies that the *scope* of the provision is limited to records that otherwise would be subject to that paragraph. Many other royalty provisions in the agreements express the royalty rate as some fraction of the ¶ 9.01 rate. (*See, e.g.,* Toto Ex. B ¶ 9.02).

In any event, ¶ 4(a) of the 2002 Amendment does not refer generally to ¶ 9.01 of the 1983 Agreement. Instead, it refers to "the royalty rate set forth in ¶ 9.01*(b)*." While the phrase "SME or its Licensee" appears in ¶ 9.01*(a)*, it does not appear in ¶ 9.01(b), which sets forth a reference rate solely for royalty provisions other than ¶ 9.01(a). (*See supra* 4).

*Second*, Toto contends that the Audiophile royalty rate is limited to sales by SME and its affiliates due to the inclusion of the term "Net Sales" in the 1986 Amendment. (Toto Br. 25–26). "Net Sales" takes account of returns, and Toto posits that there are returns only "if SME itself is selling Records." (*Id.* at 26). Toto contends that this means the Audiophile royalty rate can apply only to sales by SME. Toto's argument fails for a host of reasons:

---

[9]     In a footnote, Toto attempts to patch over the conflict between this argument and the allegations in its complaint by asserting that the term extends to *both* affiliates *and* "partners that manufacture and distribute Records in a certain foreign territory" in which SME does not. (Toto Br. 4 n.2). Notwithstanding this nod to the complaint, the balance of Toto's brief unequivocally asserts that "Licensees" refers only to affiliates. (*See id.* 8 n.5, 16–17).

- The 2002 Amendment does not use the term "Net Sales." Instead, ¶ 4(a) applies to all "sales" of Audiophile Records.

- Nothing in the definition of "Net Sales" ("gross sales less returns and credits," (Toto Ex. B ¶ 14.09)) indicates a limitation to sales by SME or its affiliates. To the contrary, the prefatory sentence of Article 9 of the recording agreements states that Toto "will be paid royalties on Net Sales of Records as hereinafter set forth"—thus applying the "Net Sales" limitation to all of Article 9, including the Lease Provision.

- Toto's unsubstantiated factual assertion that there can be returns only "if SME itself is selling Records" is wrong. (*See* Toto Br. 26). SME routinely processes returns from unaffiliated licensees, (Bondell Decl. ¶ 22), and such returns are reflected on Toto's royalty statements. (Zotian Decl. ¶ 23; *id.* Ex. B at 56, 80; *id.* Ex. D at 37, 57).

- Toto's ultimate point—that the concept of returns cannot apply to sales by Apple—is refuted by the fact that SME's agreement with Apple specifically provides for returns. (Walker Decl. ¶¶ 19–24; Toto Ex. K at Ex. G ¶¶ 1(d), 7(a)).

**Third,** even if the Audiophile Provision somehow were limited to sales by "SME and its Licensees," there is simply no support in the language of the agreement for Toto's assertion that "Licensees" is limited to corporate affiliates of SME. The agreements' definition of "Licensee" reads, in its entirety: "'Licensees' – includes, *without limitation*, subsidiaries, wholly or partly owned, and other divisions of [SME]." (Toto Exs. B, C ¶ 14.19 (emphasis added)). Nothing in that definition limits the term to affiliates of SME. *See Bekhor v. Bear, Stearns & Co., Inc.*, 2004 WL 2389751, at *5 (S.D.N.Y. Oct. 25, 2004) ("The phrases 'including' and 'without limitation' . . . each mean that the lists following them are not exhaustive and do not in any way restrict the scope . . . ."). To the contrary, the natural reading is that the definition *extends* the scope of the term by including business units that might not otherwise be considered licensees.

Toto attempts to substantiate its assertion regarding the meaning of "Licensees" by citing *Malmsteen* for the proposition that "when a list of specific terms *is combined with* a general phrase, the general phrase must be interpreted to 'refer to items of the same ilk as those specifically listed.'" (Toto Br. 16 (emphasis added)) (quoting *Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123 (S.D.N.Y. 2013)). But that is not what *Malmsteen* says. Instead,

*Malmsteen* applies the principle of *ejusdem generis*, which states that "when a general phrase, such as 'or other methods,' *follows* a list of specific terms, the general phrase must be interpreted to refer to items of the same ilk as those specifically listed." *Malmsteen*, 940 F. Supp. 2d at 133 (emphasis added); *see also Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2171 n.19 (2012) ("The canon of ejusdem generis limits general terms [that] *follow* specific ones to matters similar to those specified." (alteration in original; emphasis added; citation and internal quotation marks omitted)).

Ejusdem generis has no application here, because the term "Licensee" does not follow, or even appear as part of, a list of specific terms. Rather, the expressly non-exhaustive list of specifics appears within the term's definition. *See Franconero v. Universal Music Grp.*, Minute Order, No. 2:12-cv-03382 (C.D. Cal. Apr. 11, 2013), Dkt. 61 at 6 (rejecting *ejusdem generis* argument because "the [defined term] at issue appears *before* the list and thus cannot be limited by the subsequent terms" (emphasis added)); *see also Zurich Am. Ins. Co. v. ABM Indus. Inc.*, 397 F.3d 158, 165 (2d Cir. 2005) (refusing to apply *ejusdem generis* in the face of the phrase "but not limited to.").

Toto's asserted restriction on the scope of "Licensees" is also refuted by other provisions of the agreements. For example, the first sentence of ¶ 17.01 gives SME the unqualified right to assign its contractual rights "to any subsidiary, *affiliated* or controlling corporation." (Toto Exs. B, C ¶ 17.01 (emphasis added)). The second sentence permits SME to "*also* assign its rights hereunder to any of its *Licensees*," but only "to the extent necessary or advisable in [SME's] sole discretion to implement the license granted." (*Id.*). Were the term "Licensees" limited to affiliates, this second sentence would be entirely superfluous, since the first sentence already authorizes SME to assign its rights to any affiliate for any reason. *See Zurich*, 397 F.3d at 165

("[A] court must strive to give meaning to every sentence, clause, and word." (citation and internal quotation marks omitted)).

**Finally**, even Toto does not dispute that a sale through Amazon is a sale to a consumer by SME or its "Licensees," as Toto would limit that term. Thus, Toto's claim is that the plain meaning of the parties' agreement, and their core bargain, is that the royalty owed on the sale of a download through iTunes is fundamentally different than the royalty owed on the sale of the same download through Amazon. That is not what the contract says. Even accepting for the sake of argument that SME licenses Apple to sell downloads, the royalty provision for Audiophile Records unambiguously applies to such sales.

## II. Even in the Absence of the Audiophile Provision, the Lease Provision Would Not Apply to Sales of SME Record Releases.

All of the foregoing demonstrates that the Audiophile Provision applies to all sales of digital downloads. But even if the Audiophile royalty rate somehow did not apply to iTunes sales—and even accepting Toto's argument that SME licenses Apple to sell downloads—the Lease Provision would not apply. Sales of SME record releases by SME or its licensees fall within the plain terms of the NRC Provision, ¶ 9.01(a)—as two separate decisions of this Court have held with respect to substantially similar clauses in other contracts.

In order to avoid the straightforward meaning of the NRC Provision, Toto argues that the terms "license" and "lease" are synonymous. Then, in order to reconcile the conflict that would result from the licensing of Toto masters being governed by two different royalty provisions (the NRC and Lease Provisions), Toto arbitrarily asserts that the term "license" is limited to SME-affiliated licensees, while "lease" refers to any license to an unaffiliated third party.

As set forth below, these arguments are manufactured out of thin air. As a matter of plain English, the term "lease" is not synonymous with "license" and does not apply to rights in

intellectual property. And to the extent the Court looks to industry usage to determine the unambiguous meaning of the term "lease," the evidence exclusively shows that "lease" is used in the recording industry to refer solely to a license to a third party to use the licensor's sound recording in the third party's own product. It is not used to refer to a license to a third party to manufacture and sell the licensor's own record releases.

### A. *In the Absence of the Audiophile Provision, the NRC Provision Would Apply.*

By its plain terms, ¶ 9.01(a) applies to sales of records "consisting entirely of Master Recordings" recorded by Toto under the agreements, and sold by SME or its licensees through "Normal Retail Channels." In two separate decisions, judges of this Court have ruled that this language facially encompasses sales of downloads, even if sold by licensees.

In *Allman*, the court found that the virtually identical language in three other SME recording contracts (two of which included the verbatim definition of the term "Licensees")[10] applied to "sales of sound recordings, by [SME's] licensees through normal retail channels, including recordings that are distributed to consumers via transmission of digital music files." *Allman v. Sony BMG Music Entnm't*, 2008 WL 2477465, at *2 (S.D.N.Y. June 18, 2008), *judgment vacated with leave to amend pleadings*, No. 06 Civ. 3252 (Dkt. 37).

In *Malmsteen*, the artist's NRC provision was substantially similar to Toto's, except that it did *not* explicitly refer to sales by licensees and instead referred only to records "sold by PRI for distribution." *See Malmsteen*, No. 10-cv-3955, (S.D.N.Y. Jan. 25, 2013), Dkt. 79-5 at §§ 7.01–7.03. Nonetheless, relying on *Allman*, the Court held that the agreement's NRC provision did "not turn on the distinction between 'sales' and 'licenses,'" *Malmsteen*, 940 F. Supp. 2d at 133 n.5, and that it unambiguously applied to all downloads:

---

[10]     *Allman v. Sony BMG Music Entnm't*, Am. Compl. Exs. A-C, No. 06 Civ. 3252 (S.D.N.Y. July 10, 2006), Dkt. 4-2 through 4-4 .

> In today's market, the phrase "Normal Retail Channels" comfortably encompasses digital downloads sold through Apple's iTunes store and similar platforms—brick-and-mortar record shops have gone the way of the 8–track, the phonograph, and the mastodon. . . . *[S]ales of these downloads through media like the iTunes store are the normal retail channels in today's music industry.*

*Id.* at 132 (emphasis added).

### B. *The Plain-Language Meaning of "Lease" Is Not Synonymous With License and Does Not Apply to Rights in Intellectual Property.*

Toto contends that the terms "license" and "lease" are synonymous; that the sale of records "consisting entirely of [Toto] master recordings" by licensees therefore appears to be governed by two different royalty provisions (the NRC Provision and the Lease Provision); and that to avoid that conflict, one must construe "license" to be limited to SME-affiliated licensees, and "lease" to refer to any license to an unaffiliated third party. But the two terms are *not* synonymous, and the plain English meaning of the word "lease" does not apply to grants of intellectual property rights.

"[I]t is common practice for the courts of [New York] to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *2619 Realty, LLC v. Fid. & Guar. Ins. Co.*, 756 N.Y.S.2d 564, 566 (App. Div. 2003). The Second Circuit routinely looks to Black's Law Dictionary,[11] Webster's Third New International Dictionary,[12] and the Oxford English Dictionary[13] to establish the definition of disputed contractual terms.

---

[11]    *See, e.g.*, *United States v. Bunn*, 2013 WL 5779032, at *1 (2d Cir. Oct. 28, 2013); *United States v. Zafar*, 291 F. App'x 425, 428 (2d Cir. 2008).

[12]    *See, e.g.*, *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010); *Peconic Baykeeper, Inc. v. Suffolk Cnty.*, 600 F.3d 180, 188-89 (2d Cir. 2010); *Zafar*, 291 F. App'x at 428.

[13]    *See, e.g.*, *Dobrova*, 607 F.3d at 301; *Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 121 (2d Cir. 2010); *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 37 (2d Cir. 2009).

All three dictionaries reflect that in ordinary usage, the term "lease" describes rights related to tangible goods or real property. It does not describe a grant of intellectual property rights, nor is it synonymous with the broader term "license." (*See* SME Mot. to Dismiss Mem., Dkt. 4, 11–14; *see also id.* App'x, at A-2 through A-10). Indeed, both Black's and Webster's expressly *distinguish* "lease" from "license." (*See* Dkt. 4 at 12); *see also Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1361 (2013) (describing theater owners as "leas[ing] films from movie distributors" because they took physical possession of the film copies); GEN. COUNSEL MEM. 39111, IRS Sec(s). 48, Jan. 4, 1984 (determining that a mere grant of rights to use master recordings was not a "lease"; "The distinction between a lease and a license . . . is that a lease is a conveyance of exclusive possession of specific property."). The cases on which Toto relies likewise involve physical possession of tangible goods. (*See* Toto Br. 5, 10).[14]

The parties' separate use of the terms throughout the Recording Agreements reinforces that "lease" and "license" are not synonymous. "The use of different terms in the same agreement strongly implies that the terms are to be accorded different meanings." *NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 557 (App. Div. 2008); *see also India.com v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005) ("Effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all its terms." (citation and internal quotation marks omitted)). The Recording Agreements use the term

---

[14] *Hunt v. Commissioner* involved leases of "permanent tapes of musical performances," 938 F.2d 466, 469 (4th Cir. 1991), and the lessee in *Bentley v. Textile Banking Co.* had "possession of the tapes" at issue, 271 N.Y.S.2d 417, 418-9 (App. Div. 1966).

"license" 22 separate times in 18 separate provisions.[15]  By contrast, the distinct term "lease" appears only in the Lease Provision and its foreign equivalent.[16]

**C.**    ***As Used In the Recording Industry the Term "Lease" Refers Solely to a License for Use of a Recording in a Third-Party Product.***

Because the plain English meaning of "lease" does not apply to uses of intellectual property, the Court may choose to look to industry usage to determine the term's unambiguous meaning.[17]  *See Law Debenture Trust*, 595 F.3d at 465–66 ("Evidence as to such custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized.").  To understand the meaning of a specialized term, "the court must be informed of the meaning of the language as generally understood in that business."  *Id.* (citation and internal quotation marks omitted).

The term "lease" has a clear meaning in the recorded music industry, as testified to by Thomas Tyrrell, a thirty-year music-industry attorney and executive who participated in the negotiation of hundreds of recording agreements and who oversaw the administration of contracts in which SME and other record companies leased sound recordings to one another:

> The term "lease" has a definite, specialized meaning in the recording industry.  It refers solely to a specific type of limited license granted by a record company:  a license that permits a third party to incorporate a particular sound recording owned by the record company into the third party's own product, which third-party product is not identical to any of the licensor record company's own record releases.  Although a "lease" is technically a type of "license," the terms "lease" and "license" are two distinct concepts and are not interchangeable, as not all licenses are leases.

---

[15]    *See* Toto Ex. B ¶¶ 4.01(e), 12, 12.01, 12.02, 12.03, 12.04, 14.20, 17.01;  Toto Ex. C ¶¶ 4.01(e), 12, 12.01, 12.02, 12.03, 12.04, 12.05, 12.06, 14.20, 17.01.

[16]    Toto Ex. B  ¶¶ 9.03, 9.07; Toto Ex. C ¶¶ 9.03, 9.07.

[17]    To the extent the Court follows the plain English meaning of the term, the Lease Provision necessarily cannot apply, since Toto does not so much as allege that SME has delivered physical copies of the Toto masters to Apple.

(Tyrrell Decl. ¶ 11). Mr. Tyrrell further testified that "industry participants do not use or understand the term 'lease' to refer to a license to distribute all or substantially all of a record company's catalog of records, which is a longstanding, primary method by which a record company distributes its products." (*Id.* ¶ 26). The entirety of the Tyrrell Declaration—and a comparison between the third-party products accompanying his declaration and the SME record releases accompanying the Bondell Declaration—make clear why the term "lease" turns on the nature of the product, not on the identity of the licensee.

There is no contrary evidence in the record; every witness who testified regarding industry usage of the term "lease" affirmed this definition. Toto's contrary assertions that various former SME employees testified that "lease" means any "license to an unaffiliated third party," (Toto Br. 9–10, 20), do not accurately reflect the testimony of those witnesses:

- Andrew Gerber testified that "the term 'lease' was intended to apply to a transaction in which we authorized a third-party, typically through our special products operation, to use one or a limited number of our individual master recording tracks in manufacturing its own products which would not be identical to the product that we ourselves manufactured and sold." (Curran Decl. Ex. B, 116:5–14; *id.* Errata 2 (correcting mistranscriptions)).

- Adam Ritholz testified that the terms "lease" and "license" were used interchangeably *in the context of* a license for use in a third-party product. (Ritholz Decl. ¶ 5). He unequivocally testified that "the applicability of certain royalty provisions of the agreement doesn't turn on the nature of that agreement. It turns on what is the product? Is it the company's product, or is it a third-party product?" (*Id* Ex. B, 171:8-13).

- Martin Kaup is a former SME employee responsible for providing documents in response to audit requests. (Curran Decl. Ex. D, 13:24–18:12). He was not responsible for interpreting contracts, and he testified he had no basis to know the industry meaning of the terms "lease" or "license" or how SME understood those terms. (*Id.*, 35:22–36:6, 65:25–66:22, 68:18–69:1). His tautological testimony that "'Lease' to me means when you lease music," (*id.*, 53:7–10), could not support Toto's position in any event.

Industry usage of the term "lease" establishes that the Lease Provision applies to licenses of a master recording to a third party *for use in a third-party product*, and cannot apply to sales by licensees of SME's own record releases.

**D.** *The Structure of the Agreements Confirms that the Lease Provision Does Not Apply to SME Record Releases.*

The location of the Lease Provision within the agreements reinforces that the provision does not apply to SME's core business of distributing its record releases through record stores. Paragraph 9.01(a) is the lead royalty provision and specifically refers to records "consisting entirely of Master Recordings" delivered under the agreements. The Lease Provision does not, and it is buried at the tail end of ¶ 9.03—the so-called Special Products Paragraph—after two other provisions that indisputably refer to other ancillary exploitations. *See Popkin v. Sec. Mut. Ins. Co. of N.Y.*, 367 N.Y.S.2d 492, 495 (App. Div. 1975) (holding that the meaning of a term "may be ascertained by a consideration of the company in which it is found and the meaning of the words which are associated with it").

Toto's contention that sales of SME records consisting entirely of Toto masters, through the world's largest record store, should be governed by this boilerplate provision—and *not* by the primary royalty provision governing sales by "SME or its Licensees" through "Normal Retail Channels" of records "consisting entirely of" Toto masters—is untenable.

**III. All the Extrinsic Evidence Shows that the Lease Provision Does Not Apply to SME Downloads.**

Even if the Court determines the recording agreements are ambiguous, it should grant SME's motion, as "the extrinsic evidence illuminating the parties' intended meaning of the contract is so one-sided that no reasonable person could decide to the contrary." *N.Y. Marine*, 599 F.3d at 115 (citation and internal quotation marks omitted).

**A.** *The Parties' Course of Performance.*

"There is no surer way to find out the intent of the parties to a contract than to see what they have done." *Id.* at 119 (alterations; citations citation and internal quotations omitted). Here, the parties' course of performance plainly demonstrates that the Audiophile royalty provision

applies to sales of Toto downloads through iTunes. This evidence refutes all of Toto's unsubstantiated assertions regarding SME's accounting practices.

*First,* Toto asserts, without citing any evidence, that "SME never previously attempted to apply the Audiophile Provision to income from Music Download and Mastertone Providers," (Toto Br. 22). As set forth above, however, Toto's Rule 30(b)(6) witness conceded that SME applied the royalty rate for Audiophile Records to downloads; and Toto did not object to this royalty treatment when it audited that accounting in 2006. (*See supra* at 10).

This course of performance over a period of years is dispositive proof of the parties' understanding of the agreements. *See Record Club of Am., Inc. v. United Artists Records, Inc.*, 1991 WL 73838, at *12 (S.D.N.Y. Apr. 29, 1991) ("[Defendant's 19-month] course of performance in accepting without protest payments based on [plaintiff's] interpretation of the [disputed provision] warrants a finding that this reflected the intent of the parties . . . ."); *Jobim v. Songs of Universal, Inc.*, 732 F. Supp. 2d 407, 416-7 (S.D.N.Y. 2010) (granting summary judgment despite facial ambiguity of provision in light of "the parties' course of performance over an extensive period" and "the prevailing custom of the music industry").

*Second,* Toto asserts, again without citing to any evidence, that "all the evidence shows that the Audiophile Provision was never intended to apply to sales by unaffiliated third parties pursuant to a license." (Toto Br. 19, 27). In fact, however, the undisputed evidence shows that SME has routinely applied the royalty rate for Audiophile Records to sales of SME record releases in the form of CDs by unaffiliated third parties—without objection from Toto. (Zotian Decl. ¶¶ 17–18; *id.* Ex. B at 55–56, 80; *id.* Ex. D at 59, 75; *id.* Ex. E at 71; *id.* Ex. F at 84–85, *id.* Ex. G at 111; *id.* Ex. H at 111–12).

Toto repeatedly cites SME's corporate witness, Mark Eisenberg, for the proposition that "SME has never applied the Audiophile Provision when SME leases Master Recordings to third parties," and other similar propositions. (Toto Br. 27; *see also id.* 1, 19, 25). But Mr. Eisenberg consistently testified that the Lease Provision applies only to third-party products, and not to licenses to third parties to make and sell SME record releases. (*See, e.g.*, Curran Decl. Ex. A, 28:3–22, 54:9–22, 188:12–21, 192:4–13, 259:9–19). As Toto's 30(b)(6) witness admitted, Toto cannot identify a *single instance* in which SME applied the Lease Provision to the sale of an SME record release. (*See id.* Ex. G, 132:13–17; *see also id.*, Ex. C, 261:22–264:20).

*Finally*, Toto argues that "SME's liability [for paying Toto fifty percent net receipts on downloads] is confirmed by the way SME treats 'conditional download' and 'streaming' income." (Toto Br. 21). SME's royalty accounting with respect to conditional downloads and streams has no bearing on the royalties payable in connection with downloads, however, because the Audiophile royalty rate applies only to "sales" of Audiophile Records. Whereas permanent downloads are sold to consumers, (Toto Br. 21–22), streams and conditional downloads are not, and therefore are not subject to the Audiophile royalty rate.[18]

## B. *The Drafters' Intent.*

Evidence of "what was in the drafters' minds" is also admissible to interpret an ambiguous contract. *In re Avon Sec. Litig.*, 2004 WL 3761563, *5 (S.D.N.Y. Mar. 29, 2004) (citation and internal quotation marks omitted). Here, both sides' representatives involved in drafting the royalty provisions for Audiophile Records testified that the Audiophile Provision

---

[18]    As Sony's 30(b)(6) witness testified, *no* royalty provision in Toto's agreements applies to streaming and conditional downloads, but SME policy with respect to similarly situated artists is to pay 50% of its net receipts where masters are licensed for uses that do not constitute sales, like streaming and licenses of masters for use in films and commercials. (*See* Curran Decl. Ex. A, 217:24–218:17, 250:15–251:10; *see also* Walker Decl. at ¶¶ 35–37).

was intended to apply to all sales of SME record releases in configurations made for digital playback. (Goldstein Decl. ¶¶ 6–7; Wood Decl. ¶¶ 3–5; Harrison Decl. ¶¶ 5–7). Christopher Wood, who participated in drafting the 2002 Amendment, specified that it was specifically intended to apply to downloads of SME record releases. (Wood Decl. ¶¶ 4–5).

Similarly, the drafters of the 1977 and 1983 Agreements have uniformly testified that the Lease Provision was intended to apply only to third-party products, for which it effected a royalty reduction. (*See supra* 6). As demonstrated above, there is *no* evidence in the record that the term "lease" encompasses a license to a third party to manufacture and sell the licensor's own record releases. (*See supra* 26–28). Even Toto's 30(b)(6) witness on the topic of SME's royalty accounting to Toto could not identify any use of the word lease to refer to the sale of a record company's own products by licensees. (Curran Decl. Ex. C, 263:7–264:9).

### C.    *Industry Custom and Practice.*

"When trade usage is widespread, there is a presumption that the parties intended its incorporation by implication, unless the contract negates this implication." *Jobim,* 732 F. Supp. 2d at 417 (citation and internal quotation marks omitted).

Here, the unrebutted expert testimony of Adam Ritholz establishes that Toto's claim conflicts with industry custom. Mr. Ritholz, an industry attorney who has represented both artists—including *NSYNC, The Cars, and Lisa Loeb—and record companies throughout his more than thirty years in the music business, testified that applying a 50%-net-receipts provision to any "sales of products created and marketed by Sony for sale to consumers" would be "entirely at odds with industry practice." (Ritholz Decl. Ex. A, 4, 12).

For example, it is customary in the industry for a record company that does not control its own distribution facilities to engage a third party to manufacture and distribute its records. (Sussman Decl. ¶ 12; Tyrrell Decl. ¶ 19). Under these arrangements, known as "pressing and

distribution" or "P&D" deals, a record company chooses not to maintain its own distribution network and instead provides its masters to a third party for the manufacture and distribution of the record company's own releases. (Sussman Decl. ¶ 12; Tyrrell Decl. ¶ 17). Artist royalties on records sold under such arrangements are customarily calculated under the NRC provisions of artists' agreements, and not under provisions for 50% of the record company's net receipts from third-party licenses. (Sussman Decl. ¶ 21; Tyrrell Decl. ¶ 18).

With respect to downloads specifically, Mr. Ritholz testified that industry custom is to "treat CDs and digital downloads alike for royalty purposes," since "industry participants view iTunes no differently than any other retail music seller." (Ritholz Decl. Ex. A, 13–14). As a result, recording agreements executed since the advent of digital distribution "typically specify the same royalty rate for digital downloads as the royalty rate for physical products." (*Id.* at 14; *see also* Wood Decl. at ¶ 3).

Toto contends that Mr. Ritholz testified that "the industry custom and practice would not be to apply an Audiophile Provision to third party licensing." (Toto Br. 28). Mr. Ritholz's actual testimony, however, was that "[i]f a record company licensed its master to a third party *for inclusion on a third-party product, such as a compilation album*, the provision of the agreement pertaining to that kind of a license would apply regardless of whether it was released on a compact dis[c] or any other format." (Ritholz Decl. Ex. B, 134:22–135:19). In other words, Mr. Ritholz confirmed that the applicability of royalty provisions in a recording agreement turns on the nature of the product, not the relationship between the record company and the distributor.

Finally, Toto relies on Tom Nilsen, who purports to opine on the application of Toto's "Audiophile Royalty Provision" based on his "experience" at SME. (Toto Br. 28; Toto Ex. S, ¶ 6). This testimony cannot create a genuine fact issue regarding the scope of Toto's 2002

Amendment, because Mr. Nilsen's testimony is completely without foundation. At his deposition, Mr. Nilsen could not state whether he had ever seen a royalty provision for Audiophile Records during his tenure at SME, which ended in 1986. (Curran Decl. Ex. F, 125:15–126:10; 130:24–131:8, 25:11-13). He also could not recall the ways in which the definition of "audiophile records" included in agreements that he had reviewed during his tenure at Polygram differed from the definition in Toto's agreements. (*Id.*, 131:9–132:3). Finally, he disclaimed any experience with Toto's recording agreements. (*Id.*, 25:22–26:4). Regardless, his testimony is refuted by the parties' actual course of performance, under which the Audiophile royalty rate has routinely been applied to SME record releases manufactured and sold by unaffiliated third parties under license. (*Supra* 27–28).

## IV.     SME Sells Downloads to Apple For Resale to Consumers.

Because the royalty rate applicable to downloads does not turn on whether SME has licensed Apple to sell downloads, the Court need not construe the agreements between SME and Apple in order to grant judgment to SME. Nevertheless, the plain terms of those agreements and the admissible evidence all show that SME sells downloads to Apple for resale to consumers.

"The best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield*, 98 N.Y.2d at 569 (2002) (citation and internal quotation marks omitted).

[REDACTED] Toto claims that statements by Steve Jobs and Eddie Cue of Apple, and by former SME executive Ron Wilcox, support its assertion that SME licenses Apple to sell downloads, but these statements cannot create a genuine issue of fact, for multiple reasons:

- The statements by Steve Jobs and Eddie Cue cannot be considered because (i) they are hearsay, and (ii) Toto's motion is not accompanied by an affidavit authenticating either of

---

[19]     *See* Curran Decl. Ex. A, 96:24–98:22 ("It's an eMaster before -- to the extent an eMaster has been sold to Apple, then it's Apple's. This is at the point in time before an eMaster is sold.").

them. *See Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219-20 (2d Cir. 2004) (holding that hearsay, including prior testimony not within the hearsay exception in FRE 804(b)(1), cannot be considered on summary judgment); *Dedyo v. Baker Eng'g New York, Inc.,* 1998 WL 9376, at *4–*5 (S.D.N.Y. Jan. 13, 1998) ("[D]ocuments must be properly authenticated in order to be considered by the court at summary judgment stage").

- ███████████████████████████████████████████████████████████████████████████████████████████████████████████████

- Mr. Wilcox's quoted testimony does not say that SME has a licensing relationship with Apple or any other digital retailer. (*See* Toto Br. 20). In addition, during the pendency of this action, Toto's counsel deposed Mr. Wilcox about this document in another lawsuit, without notice to SME. Mr. Wilcox testified then—and testifies now—that the inferences Toto is attempting to draw from his written testimony are erroneous, ████████████ (Wilcox Decl. ¶¶ 9–10; *id.* Ex. A).

Thus, Toto has failed to substantiate the entire factual predicate for its lawsuit—that SME does not sell downloads to Apple, but instead licenses Apple to make and sell downloads.

## V. SME Is Entitled to Summary Judgment on its Declaratory-Judgment Counterclaim.

SME also moves for summary judgment on its third counterclaim, which seeks a declaratory ruling that SME has no obligation to distribute Phonograph Records of Toto sound recordings through any particular digital retailer. (Dkt. 56 ¶¶ 23–29). The basis for judgment is simple. In both the 1977 and 1983 Agreements, SME bargained for the unlimited right to refrain from manufacturing, selling, or dealing in Phonograph Records derived from Toto's sound recordings, without liability to Toto:

> [SME] and any Person authorized by [SME] *shall have the unlimited right* to manufacture Phonograph Records by any method now or hereafter known, derived from the Master Recordings made hereunder, and to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, *or to refrain from such manufacture, sale, and dealing,* throughout the world.

(Toto Exs. B, C ¶ 7.02 (emphasis added)).

After Toto commenced this action, and in reliance on ¶ 7.02, SME stated to Toto's counsel that SME may cease distributing Phonograph Records of Toto's sound recordings through certain digital retailers. (Jacoby Decl. ¶ 2). Toto contended in response that SME's exercise of this unlimited right would constitute "retaliation" against Toto for asserting its claims in this lawsuit, and that it therefore would breach the covenant of good faith and fair dealing implied in the parties' agreements. (*Id.* ¶ 3; Toto Br. 29).

SME is entitled to declaratory judgment, notwithstanding Toto's assertions of retaliation, for two reasons. *First,* SME's motive in exercising its "unlimited" contractual right is irrelevant as a matter of law. In *Murphy v. American Home Products Corp.*, the New York Court of Appeals held that exercising an express contractual right for retaliatory reasons does not breach the implied covenant. 461 N.Y.S.2d 232, 237 (N.Y. 1983). The Court explained that the implied covenant cannot impose an obligation "inconsistent with other terms of the contractual relationship," and that invoking the covenant to limit an employer's "unfettered right to terminate" an at-will employee—even on a retaliatory basis—would unjustly curtail the employer's bargained-for right to terminate for any reason. *Id.* at 237; *see also Dalton v. Educ. Testing Serv.*, 639 N.Y.S.2d 977, 979–80 (N.Y. 1995) (reiterating *Murphy* standard).

So too here, the implied covenant cannot limit SME's exercise of the expressly "unlimited" right for which it bargained. *See Keifer v. Sony Music Entm't, Inc.*, 778 N.Y.S.2d 496, 497 (App. Div. 2004) (rejecting claim that SME breached the implied covenant by not releasing plaintiff's album; the parties' contract gave SME "unilateral control over the release of the album," and thus "[p]laintiffs' claim of bad faith would imply an obligation inconsistent with other terms of the contractual relationship").

*Second,* even if exercise of SME's unlimited right on a retaliatory basis could breach the implied covenant, Toto points to no evidence that SME's contemplated exercise of the right would be retaliatory. The sole record evidence is that SME may wish to exercise the right because, under certain circumstances, it will be more profitable for SME to sell Toto records through some digital retailers rather than others. (Walker Decl. ¶ 28). Mere assertions in Toto's brief that SME's true motives are otherwise do not create a triable issue of fact.

CONCLUSION

For the forgoing reasons, SME respectfully requests that the Court enter summary judgment (i) dismissing the complaint and (ii) declaring that SME has no obligation to distribute Phonograph Records of Toto sound recordings through any particular digital retailer.

Dated:    February 24, 2014
         New York, New York

Respectfully submitted,

Jonathan M. Sperling
Douglas S. Curran
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
(212) 841-1010 (fax)
jsperling@cov.com
dcurran@cov.com

Jennifer H. Saperstein
**COVINGTON & BURLING LLP**
1201 Pennsylvania Ave. NW
Washington, DC 20004
(202) 662-6000
(202) 778-5682 (fax)
jsaperstein@cov.com

*Attorneys for Defendant*
*Sony Music Entertainment*

35