UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

No. 12-cv-1434 (RJS)

---

TOTO, INC.,

Plaintiff,

VERSUS

SONY MUSIC ENTERTAINMENT,

Defendant.

---

OPINION AND ORDER
September 29, 2014

---

RICHARD J. SULLIVAN, District Judge:

Plaintiff Toto, Inc. ("Toto"), an iconic Eighties rock band that topped the pop charts with hits like "Rosanna" and "Africa," brings this action against Defendant Sony Music Entertainment ("SME") for breach of contract relating to royalties owed on the band's recordings. SME in turn asserts counterclaims against Toto for breach of contract, unjust enrichment, and declaratory relief. Now before the Court are the parties' cross-motions for summary judgment on Toto's breach of contract claim and SME's declaratory judgment counterclaim. For the reasons set forth below, the Court grants SME's cross-motion with respect to the breach of contract claim, but grants Toto's motion with respect to the declaratory judgment counterclaim.

I. BACKGROUND

A. Facts

This case arises out of a contractual dispute between Toto and SME about the payment of royalties for musical recordings.[1] Toto entered into recording

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements. (Doc. No. 87 ("Toto 56.1 Stmt."); Doc. No. 95 ("SME 56.1 Stmt.").) Unless otherwise noted, where only one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. In

agreements with SME's predecessor-in-interest, CBS Records,[2] in 1977 and 1983. (Toto 56.1 Stmt. ¶ 1; SME 56.1 Stmt. ¶¶ 31–35; Declaration of Gina Merrill, dated March 22, 2012, Doc. No. 5 ("Merrill Decl."), Ex. 1 ("1977 Agmt.") and Ex. 2 ("1983 Agmt.") (collectively, "Recording Agreements" or "Rec. Agmts.").)[3] Under the Recording Agreements, Toto agreed to produce and deliver to SME recordings of musical performances, which SME would commercially exploit in various forms, including through the direct sale of records consisting wholly or in part of Toto recordings.[4] (Toto 56.1 Stmt. ¶ 2; SME 56.1 Stmt. ¶¶ 31-35; *see generally* Rec. Agmts.) In turn, SME agreed to advance funds to Toto and to pay Toto royalties on the revenues generated from exploitation of the recordings. (Rec. Agmts. ¶¶ 6.01–6.04., 9.01–9.07.)

Several provisions of the Recording Agreements are particularly relevant to this case. Paragraph 9.01(a) of the Recording Agreements (the "Basic Provision") sets the applicable royalty rate for "Net Sales of Phonograph Records consisting entirely of Master Recordings performed by [Toto] and recorded hereunder and sold by [SME] or its Licensee Through Normal Retail Channels for distribution in the United States." (Rec. Agmts. ¶ 9.01(a)(1).) Paragraph 9.06 (the "Foreign Sales Provision") sets the applicable royalty rate for "Phonograph Records sold by [SME] or its Licensees for distribution outside of the United States of America." (*Id.* ¶ 9.06.) Finally, paragraph 9.03 (the "Lease Provision") provides that "[i]n respect of any Master Recording leased by [SME] to others for their distribution of Phonograph Records in the United States, [SME] will pay [Toto] 50% of [SME's] net receipts therefrom after deduction of [various expenses]." (*Id.* ¶ 9.03.)

SME has paid Toto royalties under the rates set forth in the Basic Provision or the Foreign Sales Provision for all sales of SME products containing Toto's recordings, regardless of whether these products were manufactured by SME, a corporate affiliate, or an unaffiliated licensee. (SME 56.1 Stmt. ¶ 72.) SME has paid Toto royalties under the Lease Provision for any revenue generated from licensing Toto's recordings for incorporation into third-party products, such as compilation albums. (Toto 56.1 Stmt. ¶ 9; SME 56.1 Stmt. ¶¶ 77–80.)

In 1986 and 2002, the parties amended the Recording Agreements to reflect the growing digitization of music. (Toto 56.1 Stmt. ¶ 3; SME 56.1 Stmt. ¶¶ 82, 93; Merrill

---

deciding this motion, the Court also considered Toto's memorandum of law in support of its motion (Doc. No. 86 ("Toto Mem.")), SME's memorandum of law in support of its motion and in opposition to Toto's motion (Doc. No. 94 ("SME Mem.")), Toto's reply (Doc. No. 109 ("Toto Rep.")), and SME's sur-reply (Doc. No. 111 ("SME Sur.")), along with the affidavits and exhibits attached thereto.

[2] To avoid confusion and because the succession of interest from CBS Records to Sony Music Entertainment is not material, the Court hereinafter uses the term "SME" to refer to both Sony Music Entertainment and CBS Records.

[3] The 1977 agreement and 1983 agreement cover different recordings and differ in some minor respects, but the provisions relevant to this motion are identical. Accordingly, the Court uses "Recording Agreements" to refer to both agreements.

[4] Consistent with the Recording Agreements and the parties' briefs, the Court uses the term "recording" to refer to discrete musical performances recorded by Toto, and the term "record" to refer to products intended for distribution that reproduce one or more recordings. Hence, the song "Africa" is a recording, while the album "Toto IV," which includes "Africa" and other recordings, is a record. The Recording Agreements use the term "Master Recording" to refer to recordings and "Records" or "Phonograph Records" to refer to records. (*See* Rec. Agmts. ¶¶ 14.01, 14.05.)

Decl., Ex. 3 ("1986 Amend."); Merrill Decl., Ex. 4 ("2002 Amend.").) The 1986 amendment modified the 1983 recording agreement to include a provision (the "Audiophile Provision") setting a royalty rate for "Audiophile records," defined to include "all Records made for digital playback." (1986 Amend. ¶ 3(b).) The 2002 amendment increased the royalty rate applicable to Audiophile records and extended the Audiophile Provision to cover records created under the 1977 recording agreement. (2002 Amend.) Following these amendments, with the exception of the period from 2006 to 2012, SME has paid Toto for sales of compact discs released by SME containing Toto's recordings at the royalty rate set forth in the Audiophile Provision, which is defined as a percentage of the Basic Provision rate and is generally lower than the Lease Provision rate. (SME 56.1 Stmt. ¶ 137.) From 2006 to about 2012, SME unintentionally paid Toto at a higher rate, due to a (now remedied) error that occurred when SME switched accounting software. (*Id.* ¶¶ 144–48.)

In 2003, SME began distributing Toto's recordings as permanent digital downloads, master tones, and ringtones (collectively, "digital downloads") through companies such as Apple, Inc. and Amazon.com, Inc. (the "Digital Retailers"). (SME 56.1 Stmt. ¶¶ 104–06.) That year, it also entered into a licensing agreement with Apple to distribute SME records digitally through Apple's iTunes online music store. (*Id.* ¶¶ 109–10; Toto Mem., Ex. 10 ("2003 SME-Apple Agmt.").) SME and Apple amended their agreement in 2006 and again in 2011. (Toto Mem., Ex. 11 ("2006 Apple-SME Agmt."); Toto Mem., Ex. 12 ("2011 Apple-SME Agmt.").) Under the 2011 agreement, SME licenses its recordings to Apple so Apple can manufacture digital versions called "eMasters." (2011 Apple-SME Agmt. ¶ 2(a).) At the conclusion of the manufacturing process, Apple purchases from SME, and takes title to, the eMasters, which it then resells to end users. (*Id.*) In 2007, Sony Music Entertainment Downloads LLC ("SMED"), a wholly owned subsidiary of SME that is licensed to sell SME's records, entered into a digital distribution agreement with Amazon. (SME 56.1 Stmt. ¶¶ 122–24.) Under that agreement, SMED sells digital downloads of SME records directly through Amazon's website, and Amazon charges a fee to act as SMED's sales agent. (*Id.* ¶¶ 125–27.)

Starting in 2004, SME began paying Toto royalties for revenue generated through the sale of permanent digital downloads. (SME 56.1 Stmt. ¶¶ 139–40.) Since that time, SME has paid royalties to Toto for digital downloads under the royalty rate set forth in the Audiophile Provision (with the exception of the period from 2006 to 2012 due to the previously discussed accounting error). (*Id.* ¶¶ 139–48.) In addition to distributing permanent digital downloads, SME has licensed Toto's recordings to third parties for distribution as "streams" that are temporarily available, but not sold, to end users. (Toto 56.1 Stmt. ¶¶ 17–20; SME 56.1 Stmt. ¶¶ 155–58.) SME has paid Toto fifty percent of its net receipts for such "streams." (Toto 56.1 Stmt. ¶ 21; SME 56.1 Stmt. ¶¶ 158–59.)

In 2008, Toto audited SME's records for the royalty period from June 2006 to June 2008. (SME 56.1 Stmt. ¶¶ 163–67.) In March 2010, the auditor, Haber Corp. ("Haber"), issued a report contending that royalties on digital downloads should be "50% net receipts," pursuant to the Lease Provision. (*Id.* ¶ 167; Declaration of Douglas Curran, dated February 27, 2014, Doc. No. 97 ("Curran Decl."), Ex. M.) SME disagreed with Toto's position on the royalty rate, contending that it had correctly been applying the Audiophile Provision, which

calculated rates as a percentage of the Basic Provision rate. This suit followed.

In 2012, following the commencement of this lawsuit, SME advised Toto that it was considering ceasing the distribution of Toto's recordings through certain online retailers. (SME 56.1 Stmt. ¶ 181.) Toto advised SME that if SME did so, Toto would bring a claim for breach of the implied covenant of good faith and fair dealing. (*Id.* ¶ 182.)

B. Procedural History

Toto commenced this action on February 27, 2012. (Doc. No. 1.) The original Complaint asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, accounting, and a declaratory judgment. (*Id.*) On April 23, 2012, the Honorable Lewis A. Kaplan, District Judge, to whom this case was originally assigned, dismissed the claim for breach of the implied covenant of good faith and fair dealing. (Doc. No. 8.) Toto thereafter filed the First Amended Complaint, asserting the same four causes of action. (Doc. No. 20 ("FAC").) Subsequently, at an October 12, 2012 conference before the Honorable Andrew J. Peck, Magistrate Judge, Toto withdrew its claims for accounting and declaratory judgment. (Doc. No. 39 at 14:13–16.) On December 11, 2012, Judge Peck issued a Report and Recommendation recommending dismissal of Toto's claims, except the portion of the contract claim based on SME's alleged failure to properly pay royalties for digital downloads for the royalty period ending December 31, 2008 and later. (Doc. No. 43.) The case was reassigned to my docket on December 20, 2012, and, on January 15, 2013, the Court adopted the Report and Recommendation in its entirety. (Doc. No. 46.)

On February 8, 2013, SME answered the First Amended Complaint and asserted counterclaims for breach of contract and unjust enrichment based on Toto's retaining SME's mistaken royalty overpayments from 2006 to 2012 and for declaratory relief regarding its right to cease distribution of Toto records through any particular digital retailer. (Doc. No. 56 ("SME Answer").) Toto answered these counterclaims on March 29, 2013. (Doc. No. 62 ("Toto Answer").) At the conclusion of discovery, the parties sought, and the Court granted, leave to file the instant cross-motions for summary judgment on the remainder of Toto's breach of contract claim and on SME's declaratory judgment counterclaim. (Doc. No. 77.) Neither party moved for summary judgment on SME's remaining counterclaims for breach of contract and unjust enrichment. The motions were fully submitted on April 7, 2014. (Doc. No. 112.)

II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]," *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## III. Discussion

### A. Toto's Breach of Contract Claim

Following the Court's January 15 Order, Toto's sole remaining claim is for breach of contract with respect to the royalty payments for digital downloads, master tones, and ringtones for the period ending December 31, 2008 and later. The parties now move for summary judgment on the issue of whether royalty payments falling in this category should be calculated under the Basic Provision, the Lease Provision, or the Audiophile Provision of the Recording Agreements. Toto argues that SME's licensing arrangements with unaffiliated third parties are "leases," and that revenues generated from those arrangements are thus subject to the Lease Provision. (Toto Mem. at 8–13.) SME claims that downloads distributed through licensed digital retailers are sales of Audiophile Records subject to the Audiophile Provision. (SME Mem. at 14–20.) In the alternative, SME argues that the Basic Provision applies to sales of SME records by licensees, regardless of whether these licensees are affiliates of SME. (*Id.* at 20–25.)

Under New York law, which governs the Recording Agreements (*see* Rec. Agmts. ¶ 20.06), contractual interpretation at summary judgment takes place in two stages. First, a court must determine, as a matter of law, whether the disputed contractual terms are ambiguous. *See Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (citations and internal quotation marks omitted). "No ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 467 (citations and internal quotation marks omitted). At this stage of the analysis, a court is generally confined to the language of the contract itself "without the aid of extrinsic evidence." *Id.* (citations and internal quotation marks omitted). The district court may, however, consider proof that a contractual term has a specialized meaning within the context of a particular industry, if the proof establishes that the meaning of "the language in question is fixed and invariable in the industry in question." *Id.* at 466 (citations and internal

quotation marks omitted). If a court concludes, at this step, that the contractual terms are "complete, clear, and unambiguous," it must proceed to interpret those terms according to their "plain meaning." *Id.* at 467 (citations and internal quotation marks omitted).

However, if a court finds that the contractual language is ambiguous, then it should ordinarily deny summary judgment, since "generally[,] interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000). Nevertheless, "the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary," *id.*, or if the nonmoving party "fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language," *id.*

With these principles in mind, the Court turns to the Recording Agreements. As discussed below, the Court finds that the Audiophile Provision supplies the applicable royalty rate for the sale of permanent downloads of Toto's recordings through Digital Retailers, regardless of whether such downloads are sold by SME itself, its affiliates, or unaffiliated third-party licensees. The Court's conclusions flow from the plain meaning of the contractual language as informed by uncontroverted evidence of fixed industry usage.

Although the Court concludes that the Audiophile Provision supplies the applicable royalty rate, the analysis leading to that conclusion turns, in significant part, on the relationship between the Basic Provision and the Lease Provision. Accordingly, the Court addresses the latter two provisions first, before turning to the Audiophile Provision.

1. The Basic Provision and the Lease Provision

The Court begins with the text of the two provisions. The Basic Provision provides, in relevant part:

> [SME] will pay [Toto] a basic royalty as follows in respect of Net Sales of Phonograph Records consisting entirely of Master Recordings performed by [Toto] and recorded hereunder and sold by [SME] or its Licensee Through Normal Retail Channels for distribution in the United States: [royalty rates].

(Rec. Agmts. ¶ 9.01(a)(1).) The Lease Provision provides, in relevant part:

> In respect of catalog Phonograph Records sold by [SME's] special products operations (hereinafter, "CSP") to educational institutions or libraries or to other CSP clients for their promotion or sales incentive purposes (but not for sale to the general public through normal retail channels), the royalty shall be one-half (1/2) of the royalty rate otherwise payable. In respect of non-catalog Phonograph Records created on a custom basis for clients of CSP, the royalty rate shall be one-half (1/2) of the royalty rate otherwise payable and shall be computed on the basis of [SME's] actual sales price therefor (less all taxes and container charges). In respect of any Master Recording *leased* by [SME] to others for their distribution of Phonograph Records

> in the United States, [SME] will pay you 50% of [SME's] net receipts therefrom after deduction of all copyright, AFM and other applicable third party payments.

(*Id.* ¶ 9.03) (emphasis added). The parties' dispute turns on whether SME's licensing arrangements with Digital Retailers should be considered a "[sale] by [SME's] Licensee Through Normal Retail Channels," accounted for under the Basic Provision, or the "lease[] by [SME] to others for their distribution of Phonograph Records in the United States," accounted for under the Lease Provision.

The parties agree that the term "license," referenced in the Basic Provision, cannot mean exactly what the term "lease" means in the Lease Provision; otherwise, the Recording Agreements would prescribe different royalty rates for the same type of transaction. The parties disagree, however, about how to distinguish those two terms. Toto argues that "Licensee" includes only those licensees that are corporate affiliates of SME, while the term "lease" refers to a license to any party, regardless of whether that party is affiliated with SME. SME argues that "Licensee" includes all licensees, regardless of whether they are corporate affiliates of SME, and that the term "lease" refers to a special license whereby a third party incorporates the recordings into its own product, such as a compilation record.

a. "Licensee"

The parties' disagreement over the meaning of the term "Licensee" centers on the relationship between the contractual term "Licensee" and its ordinary legal definition – a party that has been given permission to "do a thing which the licensor would otherwise have a right to prevent." *W. Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 118 (2d Cir. 1930). Toto argues that "Licensee" includes only those licensees that are corporate affiliates of SME. SME, on the other hand, correctly contends that "Licensee" means exactly what its ordinary legal definition suggests.

Under the Recording Agreements, the term "Licensee" is defined to "include[], without limitation, subsidiaries, wholly or partly owned, and other divisions of [SME]." (Rec. Agmts. ¶ 14.19.) Toto argues that the *ejusdem generis* canon supports its narrow interpretation of the term "Licensee." (Toto Mem. at 16.) By Toto's telling, *ejusdem generis* applies "when a list of specific terms is *combined* with a general phrase" so that "the general phrase must be interpreted to 'refer to items of the same ilk as those specifically listed.'" (Toto Mem. at 16) (quoting *Malmsteen v. Universal Music Grp.*, 940 F. Supp. 2d 123, 133 (S.D.N.Y. 2013) (emphasis added)). But *Malmsteen* clearly states that the canon applies "when a general phrase . . . *follows* a list of specific terms." 940 F. Supp. at 133 (emphasis added). Indeed, the Second Circuit has declared that the *ejusdem generis* interpretive principle stands for the proposition that "general terms that *follow* specific ones are interpreted to embrace only objects of the same kind or class as the specific ones." *United States v. Amato*, 540 F.3d 153, 160 (2d Cir. 2008) (emphasis added).

Obviously, *ejusdem generis* has no application here. The word "Licensee" does not follow the more specific terms "subsidiaries, wholly or partly owned" and "other divisions of [SME]." In fact, it is not even part of the definition – it is the very term that is being defined. Instead, the interpretive principle that is properly applicable here is that the inclusion of specific items in a general definition does not limit the scope of the defined term. By

the plain terms of this canon, the *inclusion* of SME affiliates in the definition of "Licensee" does not limit the scope of that term. *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 132-33 (2012) (observing, with citation to legal authority, that the term "includes" should not be understood to be limiting). This interpretive principle holds even in the absence of explicit non-limiting language. But where there *is* explicit non-limiting language – "without limitation" – there is no colorable argument that the included items are intended to limit the general term. Indeed, it is hard to imagine what purpose the words "without limitation" could serve other than to specifically foreclose the argument Toto makes now. Accordingly, the Court finds no support for Toto's proposed interpretation of "Licensee" as being limited to SME affiliates.

Indeed, as SME points out, there is affirmative textual evidence that no such limitation exists. Paragraph 17.01 of the Recording Agreements provides:

> [SME] may assign its rights [under the Recording Agreements] in whole or in part to any subsidiary, affiliated or controlling corporation or to any Person owning or acquiring a substantial portion of the stock or assets of [SME], and such rights may be assigned by any assignee thereof; provided, however, that any such assignment shall not relieve [SME] of any of its obligations hereunder. [SME] may also assign its rights hereunder to any of its Licensees to the extent necessary or advisable in [SME's] sole discretion to implement the license granted.

(Rec. Agmts. § 17.01.) As SME points out, the second sentence – which permits SME to assign its rights to "Licensees to the extent necessary or advisable . . . to implement the license granted" – is superfluous if "Licensees" is read to include only SME affiliates, since the first sentence allows SME to assign its rights to any of its affiliates without any such limitation. (SME Mem. at 19–20.) Since courts disfavor interpretations that render contractual provisions redundant or superfluous, *Malmsteen*, 940 F. Supp. 2d at 133 (citing *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002)), Toto's reading of the contract is, again, untenable.

Because there is no support for the position that "Licensee" is restricted to SME affiliates, and because the parties otherwise agree that "Licensee" would – but for this alleged restriction – apply to all licensees of SME, including the Digital Retailers, the Court finds that the term "Licensee" includes the Digital Retailers. Thus, in the absence of another relevant contractual provision, the Basic Provision provides the royalty rate for sales by the Digital Retailers.

b. "Lease"

In an obvious effort to avoid the plain meaning of the term "Licensee," Toto contends that "lease" is synonymous with "license" and that the term "lease" includes any and all licenses to third parties. SME, by contrast (and more plausibly), asserts that the term "lease" as used in the Recording Agreements is limited to those licenses that permit third parties to incorporate SME recordings in their own unique products, such as compilation records or films.

Although the Recording Agreements do not contain a contractual definition of the term "lease," SME has submitted uncontroverted evidence that, in the recording industry, a "lease" is a license that allows a third party to incorporate the

licensor's recording into its own product. *See Law Debenture Trust Co. of New York*, 595 F.3d at 466 (holding that proof of industry custom and usage is not extrinsic evidence). For example, the declaration of Thomas Tyrrell – a veteran music-industry executive and attorney who negotiated hundreds of recording agreements – makes clear that a lease in this context "refers solely to a specific type of limited license . . . that permits a third party to incorporate a particular sound recording owned by the record company into the third party's own product, which third-party product is not identical to any of the licensor record company's own record releases." (Declaration of Thomas Tyrrell, dated February 27, 2014, Doc. No. 103 ("Tyrrell Decl.").) He further declared that the industry does not use the term "lease" to refer to "a license to distribute all or substantially all of a record company's catalog of records." (*Id.*) SME has therefore established that the term "lease" turns on the nature of the licensee's product, not on the licensee's identity.

Toto has submitted no contrary evidence of industry custom, and its arguments as to the meaning of "lease" are unavailing. In essence, Toto claims that SME has admitted that the terms "lease" and "license" are interchangeable, but it bases this assertion on clear misrepresentations of SME's witnesses' testimony. For example, Toto represents that Andrew Gerber and Adam Ritholz, two former SME employees, testified that "lease" means "license" in the Recording Agreements. (Toto Mem. at 10, 19–20.) But Gerber clearly testified that "lease" applied to "a transaction in which [SME] authorized a third-party, . . . to use one or a limited number of our individual master recording tracks in manufacturing its own products which would not be identical to the product that we ourselves manufactured and sold." (Curran Decl., Ex. B.) And Ritholz's testimony that "lease" and "license" can be used interchangeably was only within the context of third parties using the recording in their own product. (Declaration of Adam Ritholz, dated February 27, 2014, Doc. No. 101 ("Ritholz Decl.").) Therefore, contrary to Toto's representations, SME's witnesses were uniform in their definition of "lease."

Additionally, Toto focuses its dictionary-based argument on gross generalizations of the definitions of "license" and "lease" to simply mean "to grant permission." (Toto Mem. at 9.) But even the dictionary definitions of the terms reflect that they are not synonymous, with "lease" generally pertaining to rights in real or tangible property, and "license" typically applying to intellectual property. (SME Mem. at 23) (citing Black's Law Dictionary and Webster's Third New International Dictionary). Given that both the Basic and Lease Provisions pertain to rights in intellectual property, the dictionary definitions lend credence to SME's contention that "lease" is an industry-defined term reserved for licenses to third-parties to incorporate recordings in their own products.

Finally, Toto's attempt to prove its point with an example of the parties' past performance – SME paid Toto under the Lease Provision "when SME licensed Master Recordings to unaffiliated third parties for those third parties to distribute *compilation* albums embodying Master Recordings" (Toto Mem. at 19) (emphasis added) – simply reinforces SME's argument and does not support Toto's contention that *all* third party licenses are "leases."

Because Toto fails to credibly challenge SME's asserted industry definition of the word "lease," the Court finds the term to be sufficiently "fixed and invariable" to inform

the unambiguous meaning of the contractual terms. Accordingly, the Court determines that the term "lease," as used in the Lease Provision, means a license for a third party to incorporate the licensor's recording in its own product. Because there is no dispute that SME's arrangements with the Digital Retailers are not such a license, the Lease Provision does not apply.

2. The Audiophile Provision

The Court next turns to whether the Audiophile Provision covers SME's arrangements with Digital Retailers, and if so, whether it trumps the Basic Provision. Clearly, the answer to both questions is yes.

The Audiophile Provision defines "Audiophile records" as:

> Records (other than audiovisual Records) marketed in specially priced catalog series by reason of their superior sound quality or other distinctive technical or artistic characteristics (all Records made for digital playback are Audiophile records), and the term "standard records" shall mean Records other than Audiophile Records and audiovisual Records.

(1986 Amend. ¶ 3(b).) Accordingly, downloads from Digital Retailers are unquestionably "Records made for digital playback." (SME 56.1 Stmt. ¶ 100–03; SME Mem. at 15.) The Audiophile Provision specifies that its royalty rate applies to "sales after December 31, 1998 of Audiophile Records released under either of the [Recording] Agreements." (2002 Amend. ¶ 4(a).) Notably, the Audiophile Provision makes no distinction based on who makes the sales, and because Toto acknowledges (Toto Mem. at 10), and common sense dictates, that Digital Retailers "sell" downloads, the Audiophile Provision clearly applies to digital downloads. Even interpreting the Audiophile Provision as a modification of the Basic Provision, and therefore construing "sales" to apply only to those by "SME and its Licensees" as provided in the Basic Provision, the Audiophile Provision still applies to digital downloads from the Digital Retailers since the Court has already determined that the term "Licensee" includes Digital Retailers.

As to the second question, the Court easily concludes that the Audiophile Provision trumps the Basic Provision. Included in the Audiophile Provision is the clause that it applies "[n]otwithstanding anything to the contrary" in any other royalty provision. The Second Circuit "has recognized many times that under New York law, clauses similar to the phrase '[n]otwithstanding any other provision' trump conflicting contract terms." *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010) (listing cases). Moreover, Toto concedes that the Audiophile Provision controls when both it and another royalty provision are applicable. (Toto Rep. at 14.)

Because the Court concludes the Audiophile Provision applies to digital downloads from Digital Retailers, it holds that the Audiophile Provision provides the applicable rate. Since there is no dispute that SME has paid Toto the Audiophile Provision rate during the relevant period, the Court finds that there has been no breach and grants summary judgment for SME on Toto's breach of contract claim.

B. SME's Declaratory Judgment Counterclaim

The parties also move for summary judgment on SME's declaratory judgment

counterclaim. This counterclaim arose from Toto's threat to sue SME for breach of the implied covenant of good faith and fair dealing if SME ceased distributing Toto records through certain retailers. (SME Rep. at 15.) Citing the express language of the Recording Agreements, which provides that "[SME] . . . shall have the unlimited right to manufacture Phonograph Records . . . and to sell, transfer or otherwise deal in the same . . . or to refrain from such manufacture, sale, and dealing," SME seeks a declaratory judgment that it has no obligation to distribute Toto records through any particular digital retailer. (SME Mem. at 33.)

A declaratory judgment action is ripe for judicial review only if "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (citing *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). The Second Circuit has held that a controversy is not sufficiently "immedia[te] or real[]" when "the contingent event upon which the controversy rests is unlikely to occur." *In re Prudential Lines Inc.*, 158 F.3d 65, 70 (2d Cir. 1998).

Here SME is seeking declaratory relief on a dispute that is, at this point, far more hypothetical than real. Toto *might* sue SME for breach of the implied covenant *if* SME decided to cease distributing Toto records through *certain* (unnamed) retailers. SME's claim, based on three layers of contingencies, is not enough to present a "substantial" dispute of sufficient "immediacy" or "reality" to constitute a ripe controversy. *See, e.g.*, *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003 (explaining that courts "have consistently interpreted [the Declaratory Judgment Act's] language as a broad grant of discretion to district courts"). The Court therefore grants summary judgment for Toto on SME's declaratory judgment claim.

## IV. Conclusion

For the reasons set forth above, the Court GRANTS SME's cross-motion, and denies Toto's motion, for summary judgment on Toto's breach of contract claim; and GRANTS Toto's motion, and denies SME's cross-motion, for summary judgment on SME's declaratory judgment counterclaim.

Because neither party addressed SME's remaining counterclaims for breach of contract and unjust enrichment in their summary judgment briefing, IT IS HEREBY ORDERED THAT the parties shall submit a joint letter to the Court no later than October 29, 2014 concerning the next contemplated steps in this case.

The Clerk of the Court is respectfully directed to terminate the motions pending at docket entries 84 and 89.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 29, 2014
New York, New York

* * *

Plaintiff is represented by Richard S. Busch of King & Ballow, 315 Union Street, Suite 1100, Nashville, TN 37201, and Kenneth E. Gordon of Gordon, Gordon & Schnapp, P.C., 437 Madison Avenue, Thirty-ninth Floor, New York, NY 10023.

Defendant is represented by Jonathan M. Sperling and Douglas S. Curran of Covington & Burling LLP, 620 Eighth Avenue, New York, NY 10018, and Jennifer H. Saperstein of Covington & Burling LLP, 1201 Pennsylvania Avenue NW, Washington, DC 20004.